IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

SIGNATURE FLIGHT SUPPORT      )
CORPORATION,                  )
                              )
      Plaintiff,              )
                              )
                              )
      v.                      )      1:08cv955 (JCC)
                              )
                              )
LANDOW AVIATION LIMITED       )
PARTNERSHIP,                  )
                              )
      Defendant.              )

## M E M O R A N D U M   O P I N I O N

        This matter is before the Court on Plaintiff's Motion
for a Preliminary Injunction.  For the following reasons, the
Court will deny Plaintiff's Motion.

### I. Background

        The facts alleged in Plaintiff's Amended Complaint are
as follows.  Plaintiff is a Fixed Base Operator ("FBO").  It
operates numerous FBOs at airports throughout the United States,
including Washington Dulles International Airport ("Dulles").
FBOs are airport service centers that offer aircraft handling,
fuel, parking, maintenance, de-icing, ground services, baggage
handling, crew rooms, passenger lounges, and related services to
the general aviation and charter aviation industries - i.e., the
non-commercial aviation industries.

1

Plaintiff entered into a concession contract with the Metropolitan Washington Airports Authority ("MWAA") in 1997 (the "Concession Contract"), which set forth the terms and conditions under which Plaintiff acts as an FBO at Dulles.  The Concession Contract also awarded Plaintiff an option on an undeveloped parcel of land at Dulles contiguous to the FBO's site.  Plaintiff exercised this option and entered into a supplemental agreement ("Supplemental Agreement") setting forth Plaintiff's rights in that parcel.  It also entered into a Ground Sublease Agreement ("GSA") with Defendant through which some of Plaintiff's rights and obligations were "passed through" to Defendant.  The Supplemental Agreement and GSA were signed in 2004.

Under the GSA, Defendant is authorized by both Plaintiff and the MWAA to operate the Dulles Jet Center, a corporate hangar facility adjacent to Plaintiff's FBO facilities, but not to act as an FBO.  The GSA gives Plaintiff the exclusive right to provide fuel to Defendant's clients, to direct and service all arriving transient aircraft, and to direct "overflow" transient traffic to Defendant, if necessary.

Since the opening of the Dulles Jet Center in 2006, Defendant has improperly expanded the scope of the services that it provides there, invading the business reserved by Plaintiff and the MWAA for Plaintiff.  Defendant is soliciting transient aircraft, servicing approximately 6 transient aircraft per day,

2

and holding itself out as an FBO.  Defendant has not shared any
of its fees from these activities with Plaintiff.

On September 15, 2008, Plaintiff filed a complaint
alleging five counts (the "Complaint"): Count I for declaratory
judgment, Count II for breach of contract, Count III for
intentional interference with contract, Count IV for an
accounting and disgorgement, and Count V for permanent injunctive
relief.  On October 17, 2008, Defendant filed an Answer and
Counterclaim and a Motion to Dismiss Count III.  After briefing
and oral argument, the Court granted Defendant's Motion to
Dismiss Count III and gave Plaintiff leave to amend.  Plaintiff
filed an amended complaint (the "Amended Complaint") on December
2, revising Count III to state a claim for intentional
interference with prospective business or economic advantage and
requesting both preliminary and permanent injunctive relief in
Count V.

On December 1, Plaintiff moved for a preliminary
injunction.  The motion included declarations from two of
Plaintiff's employees.  On December 15, Defendant opposed the
motion, submitted its own declarations, and moved to strike the
declarations submitted by Plaintiff.[1]  Plaintiff filed a reply
and two supplemental declarations on December 19.  After oral

---

[1] The Court denied the motion to strike in a Memorandum Opinion and
Order dated January 13, 2009.

3

argument, the Court accepted supplemental declarations from both parties.  The Motion for a Preliminary Injunction is before the Court.

## II. Standard of Review

The issuance or denial of a preliminary injunction or temporary restraining order "is committed to the sound discretion of the trial court."  *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989).  The trial court applies a "balance-of-hardship" test to determine whether an injunction is appropriate.  *See Blackwelder Furniture Co. v. Seilig Mfg. Co.*, 550 F.2d 189, 194 (4th Cir. 1977); *Ry. Labor Executives' Ass'n v. Wheeling Acquisition Corp.*, 736 F. Supp. 1397, 1401-02 (E.D. Va. 1990) (Ellis, J.) (applying the *Blackwelder* test to determine whether to issue a temporary restraining order).  The party requesting the injunction must also make a clear showing of irreparable harm.  *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (citing *Rum Creek Coal Sales, Inc. v. Caperton*, 926 F.2d 353, 360 (4th Cir. 1991)).  The threatened irreparable harm must be "actual and imminent," not remote or speculative.  *Id.* (internal quotation omitted).

Under the test, a court should examine the following four factors: (1) the likelihood of irreparable harm to the plaintiff if the injunction is denied; (2) the likelihood of harm

4

to the defendant if the injunction is granted; (3) the plaintiff's likelihood of success on the merits; and (4) the public interest. *See Hughes Network Sys., Inc. v. InterDigital Comm'n Corp.*, 17 F.3d 691, 693 (4th Cir. 1994); *Blackwelder*, 550 F.2d at 193-96. In a recent case, the Supreme Court has implied that the third factor is essential. "A party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits." *Munaf v. Geren*, __ U.S. __, 128 S. Ct. 2207, 2219 (2008) (quotation and citations omitted). Citing *Munaf*, the Court has further stated that, to be eligible for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Counsel*, __ U.S. __, 129 S. Ct. 365, 374 (2008) (citations omitted).

### III. Analysis

A. <u>Likelihood of Irreparable Harm to Plaintiff</u>

Plaintiff must show a likelihood, rather than a mere possibility, of irreparable harm to be eligible for a preliminary injunction. *Winter*, __ U.S. __, 129 S. Ct. at 375-76. The harm must be "actual and imminent," not speculative or remote in time. *Direx Israel, Ltd.*, 952 F.2d at 812 (internal quotation omitted).

5

Irreparable injury occurs when money damages "are difficult to ascertain or are inadequate"; if the projected loss can be readily calculated, the harm is not irreparable. *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551-52 (4th Cir. 1994) (quotation and citations omitted).

A plaintiff can demonstrate irreparable injury by showing that it faces a "permanent loss of customers to a competitor or the loss of goodwill." *Multi-Channel TV Cable Co.*, 22 F.3d at 552 (citing *Merrill Lynch, Pierce, Fenner and Smith v. Bradley*, 756 F.2d 1048, 1055 (4th Cir. 1985)). In *Merrill Lynch*, the court upheld an injunction issued to stop a former account executive subject to a non-competition agreement from soliciting customers. "Merrill Lynch," the court stated, "faced irreparable, noncompensable harm in the loss of its customers." 756 F.2d at 1055.

Plaintiff claims that, without a preliminary injunction, Defendant will cause it irreparable harm in several respects. First, it points to the loss of existing and potential customers that it has suffered and will continue to suffer as a result of Defendant's behavior. Second, it argues that Defendant's actions have eroded its goodwill and reputation in the FBO industry. Third, it suggests that it may not be able to comply with the Concession Contract it entered into with the MWAA

6

if Defendant continues to service transient aircraft and otherwise operate as an FBO.

### 1. Loss of Customers

Between April and October 2008, Plaintiff claims, it has recorded the tail identification numbers of more than 175 of its former customers using the Dulles Jet Center for FBO-type services. *See* Pl.'s Mem. in Supp. at 12; Bennett Decl. at ¶¶ 27-28.  Plaintiff estimates that Defendant's conduct has caused it – and continues to cause it – to lose at least six customers per day.  During the same time period, Plaintiff found that nearly 300 transient aircraft, including its former customers and more than 100 potential customers, used the Dulles Jet Center.  *Id.* at 14.  In anticipation of the Presidential Inauguration on January 20, 2009, Plaintiff expects to see a substantial increase in business and claims that, because of the estimated increase in traffic, Defendant's actions pose an even greater threat to its ability to generate revenue and develop new customers by providing services to transients.  *Id.* at 12-13.

Plaintiff has shown that Defendant's actions are causing it to lose customers, although the number of customers lost is relatively in comparison to Plaintiff's overall transient-servicing business.  While a loss of customers does not automatically entitle a plaintiff to injunctive relief, *see Safeway, Inc. v. CESC Plaza Ltd. P'ship*, 261 F. Supp. 2d 439

7

(E.D. Va. 2003), the structure of the FBO market at Dulles and the nature of the services provided by the parties may make the cost attributable to the loss of customers somewhat difficult to determine.

Plaintiff claims that its damages are especially difficult to calculate because it offers services to transient aircraft in an "a la carte" fashion.  Pl.'s Mem. in Supp. at 16-17 (citing *Multi-Channel TV Cable Co.*, 22 F.2d at 552).  In *Multi-Channel*, the Fourth Circuit upheld the grant of a preliminary injunction as not clearly erroneous where the plaintiff's new "a la carte" pricing system made it difficult to use historical price information to estimate revenue loss.  22 F.2d at 552.  The case, however, is not precisely on point. Here, Defendant records, and can produce, a list of the services it provides to transient aircraft.  Even if Plaintiff provides services in an "a la carte" fashion, Defendant's records will give some indication of what services each transient aircraft would have requested.[2]  While this may not be enough information to provide a perfectly accurate measurement of damages, it does set a solid baseline for the amount of monetary harm Plaintiff will have suffered.

---

[2] This assumes that all transient aircraft choosing Defendant's services would have otherwise chosen Plaintiff rather than Plaintiff's competitor at Dulles, Landmark Aviation.  Plaintiff is correct that the presence of another FBO at Dulles makes a precise measurement of damages difficult.  It is unclear at this point whether Plaintiff has historical data on its market share at Dulles that would help solve this problem.

Plaintiff's argument that damages are difficult to calculate because, first, it recently changed its fuel pricing structure, and second, the pricing of its services depends on whether or not a transient aircraft purchases fuel, falls short. Plaintiff is the sole provider of fuel to all of its customers and to all of Defendant's transient customers. Plaintiff, then, knows which transient customers purchase fuel and which do not. Here again, while a new fuel pricing structure may make the *exact* amount of damages uncertain, it should not prevent the parties from making a reasonable forecast of Plaintiff's lost revenue on the approximately six transient aircraft Defendant services each day.

Similarly, the fact that Plaintiff and Defendant offer overlapping but different services may complicate a precise calculation of damages. It will not, however, make such a calculation a fruitless exercise. While a calculation of damages due to lost customers may be somewhat fuzzy at the edges, it is readily anchored by information in the possession of both parties. Plaintiff's arguments about the difficulty of calculating damages due to lost customers do not, on their own, rise to the level of irreparable harm.

The Court agrees with Plaintiff, however, that Defendant's actions may be undermining Plaintiff's ability to compete for new customers as one of only two FBOs at Dulles.

Plaintiff won a competitive bidding process to become an FBO at Dulles.  If Defendant is improperly acting as an FBO, it is necessarily intruding on Plaintiff's quasi-monopoly in a manner difficult to measure in monetary form.  Thus, the Court will find that Plaintiff has met its burden of showing irreparable harm.

Plaintiff's other arguments as to why the harm it faces cannot be quantified are inherently speculative.  Plaintiff claims that Defendant's poaching of transient customers at Dulles will hurt Plaintiff's other FBOs at airports throughout the United States and internationally.  Defendant, though, does not operate an FBO at any airport other than Dulles.  Plaintiff's argument supposes that customers who find Defendant's services more amenable at Dulles will continue to avoid Plaintiff elsewhere.  This argument seems to under-estimate the business savvy of transient aircraft operators.  Presumably, those operators choose the best services for the best price at whatever airport they happen to land.  While Plaintiff may face some indeterminate loss of reputation based on a perception that Defendant offers better service at one airport, a finding that this loss of reputation would translate into substantial harm to Plaintiff's entire nationwide business requires too much speculation to be considered at this preliminary stage.

2. <u>Goodwill</u>

Plaintiff's allegations that Defendant's actions have

cost it goodwill do not suffice to show much, if any, additional irreparable harm.  Referencing *Blackwelder*, Plaintiff complains that the "[w]ord of mouth grumbling" of Dulles Jet Center customers is harming Signature's reputation.  *Blackwelder Furniture Co.*, 550 F.2d at 197.  In *Blackwelder*, the defendant's decision to terminate the plaintiff as an authorized dealer of its furniture could have led to the plaintiff's inability to fulfill orders for furniture made by the defendant.  In theory, this would harm plaintiff's reputation and lead to "grumbling." *Id.*  The customers in this case, however, are not complaining about something that Defendant did to Plaintiff that inhibits Plaintiff's ability to serve transient aircraft.  Instead, the "grumbling" cited by Plaintiff has to do with Plaintiff's purportedly poor fuel service – a pre-existing problem that is independent of the threatened harm to Plaintiff.  *See* Farmer Decl. at Tab 5.  Defendant has nothing to do with Plaintiff's service of fuel to transient aircraft.

Additionally, the GSA expressly permits Defendant to complain to the MWAA about Plaintiff's failure to live up to its contractual agreements with Defendant.  *See* GSA ¶ 4.2(a). Defendant's communications to the MWAA – which include the allegedly "grumbling" letters – were, by their own description, preliminary to a more formal petition under GSA ¶ 4.2(a).  The collection of letters about Plaintiff's alleged contractual

failures is factually distinguishable from the kind of direct damage to goodwill at issue in *Blackwelder*.  The "loss of goodwill" argument provides weak support, at best, for finding irreparable harm.

### 3. Inability to Satisfy Contractual Obligations

Finally, Plaintiff argues that irreparable harm can occur when one party places another in a position in which it may not be able to satisfy its contractual obligations to a third party.  Pl.'s Mem. in Supp. at 22 (citing *E. Tenn. Nat. Gas Co. v. Sage*, 361 F.3d 808, 829 (2004)).  *Sage*, on which Plaintiff relies for this argument, held that a plaintiff gas company could show irreparable harm in part because, without a preliminary injunction allowing it to complete a pipeline, it would be forced to breach contracts requiring it to provide natural gas to local power plants.  The Fourth Circuit explained that these breaches would negatively affect customers and consumers.  Breaking the contracts would also cost the gas company a significant amount of money.  *Sage*, 361 F.3d at 829.

The conclusion that irreparable harm would ensue was based, not on the threatened breach of contract itself, but on the harm that such a breach would cause to others who were relying on the pipeline's timely construction – and the resultant loss to the plaintiff gas company.  *Id.*  In the present case, the threatened harm does not appear to extend to anyone with whom

Plaintiff is in a contractual relationship except in a purely speculative manner.  The MWAA itself has stated that Plaintiff is in compliance with its obligations under the Concession Contract. Farmer Decl. at Tab 6.  At this time, the Court will not find that any purported contractual violations on the part of Plaintiff, caused by Defendant's activities, provide an independent ground on which to find irreparable harm.

    4. <u>Delay</u>

    A plaintiff's delay in seeking injunctive relief weighs against it when a court balances the relative harms to the parties.  *See Quince Orchard Valley Citizens Assoc., Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989); *see also Candle Factory, Inc. v. Trade Assocs. Group, Ltd.*, 23 Fed. Appx. 134, 138 (4th Cir. 2001); *Equity in Athletics, Inc. v. Dep't of Educ.*, 504 F. Supp. 2d 88, 99 n.3 (W.D. Va. 2007).  Here, Defendant has submitted evidence showing that Plaintiff delayed bringing this suit for more than nine months after mediation efforts between the parties failed and the parties ended negotiations regarding the purchase of Defendant by Plaintiff.  Nathan Landow Supp. Decl. at ¶ 7; David Landow Supp. Decl. at ¶ 31.[3]  Plaintiff did

        [3] Through one of its declarations submitted prior to the hearing on this injunction, Plaintiff claimed that, since shortly after the opening of the Dulles Jet Center, Plaintiff and Defendant were continuously involved in mediation, "principal to principal negotiations," or litigation.  Farmer 1st Supp. Decl. at ¶ 13.  In supplemental declarations submitted after the hearing, Defendant's executives provided more specific information on the timing of mediation and the negotiations, which, they testify, ended in late 2007.  Nathan Landow Supp. Decl. at ¶ 7; David Landow Supp. Decl. at ¶ 31. Plaintiff did not respond to or contest Defendant's most recent evidence

not respond to Defendant's most recent statements regarding the timing of the mediation and negotiation provided in these declarations.  Plaintiff also waited more than two months after filing this lawsuit to move for a preliminary injunction.[4]

In *Quince Orchard*, the Fourth Circuit found that a nine-month delay in filing suit could show "'an absence of the kind of irreparable harm required to support a preliminary injunction.'" 872 F.2d at 80 (quoting *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985)).  Substantial delay in filing suit affects the balance of harms between the parties. *Id.*  A subsequent Fourth Circuit decision interpreted *Quince Orchard* as requiring a prejudicial impact related to the delay. *Candle Factory, Inc.*, 23 Fed. Appx. at 138.

Here, Defendant knew – shortly after opening the Dulles Jet Center – that Plaintiff objected to its servicing of transient aircraft.  After negotiations stopped, but before Plaintiff brought this lawsuit, Defendant invested time and resources to build a business that it believed it had a right to build – without Plaintiff taking any legal action until more than nine months had passed.  This delay prejudiced Defendant to the extent that it expended money and other resources to build a

---

regarding the timing of mediation and negotiation.

[4] David Landow's supplemental declaration acknowledges that a single settlement meeting took place on November 15, 2008 – more than two months after Plaintiff filed this lawsuit.  David Landow Supp. Decl. at ¶ 31.

business based on the transient aircraft that, the Amended
Complaint claims, Plaintiff has the exclusive right to pursue.

Finally, Plaintiff's emphasis on the upcoming
Presidential Inauguration, which it claims will lead to a massive
increase in transient air traffic and, thus, exacerbate the harms
it faces, does not strengthen its case.  Both parties knew that
the 44th President would be sworn in on January 20, 2009.  Any
increased loss of revenue or customer relationships will be
caused by an event long foreseen by both parties – even if the
precise extent of the increase was not predictable until more
recently.  The timing of the Inauguration does not bolster
Plaintiff's case.  Nor will the Court grant an injunction to
assuage Plaintiff's speculative fears that a safety incident
could occur due to runway overcrowding or the logistical
difficulties inherent in having two teams handle transient
aircraft near the Dulles Jet Center.[5]  *See* Bennett 2d Supp. Decl.
at ¶¶ 4-8.

### 5. Irreparable Harm to Plaintiff

As noted above, the Court agrees that Plaintiff has
made a limited showing of irreparable harm.  Plaintiff has not,
however, demonstrated that the *quantum* of harm will be
substantial.  The fact that damages may be difficult to calculate

---

[5] Both parties submitted evidence regarding past safety incidents around
the parties' runway areas.  The evidence, though, is conflicting,
inconclusive, and does not clearly apply to the questions before the Court.

does not necessarily bear on the extent of harm.  Plaintiff has shown a loss of transient service fees on a handful of aircraft each day.  It has also shown that Defendant's actions may be depriving it of its right to form new customer relationships as one of two legitimate FBOs at Dulles.  Here as well, the harm is difficult to calculate mathematically.  Plaintiff, though, has not suggested that these harms affect the commercial viability of its business at Dulles, much less that of its nationwide network of FBOs.  At this time, the Court is not convinced that the threatened harm to Plaintiff is substantially greater than its lost servicing revenues.  Plaintiff's delay in bringing suit further weakens its showing of irreparable harm.

    B. <u>Harm to Defendant</u>

       Plaintiff claims that an injunction will not harm Defendant because it would only require Defendant to abide by the terms of the GSA.  Even with a preliminary injunction in place, Plaintiff argues, Defendant will continue to receive the benefit of its bargain.

       In response, Defendant suggests that a preliminary injunction will deprive it of its contractual rights because it would forbid Defendant from doing what the GSA allows it to do.  Def.'s Mem. in Opp'n at 27-28.  Defendant also claims that the injunction will injure its reputation and relationships with customers.  Finally, Defendant argues that the requested

16

injunction threatens its commercial viability and would require it to reconfigure its business and lay off employees.  Def.'s Mem. in Opp'n at 28.

Plaintiff cites cases holding that an injunction that merely forces a defendant to abide by a contract does not unduly burden the defendant.  *See JTH Tax, Inc. v. Lee*, 514 F. Supp. 2d 818, 825 (E.D. Va. 2007); *see also W. Insulation, L.P. v. Moore*, 2008 WL 191335, at *4 (E.D. Va. Jan. 22, 2008).  Those cases, however, address whether to grant permanent injunctions.  The relevant defendant in each case had already lost on the merits.[6] Here, of course, the Court has yet to decide the merits of the case.  In this situation, it is appropriate to weigh the actual harm that a preliminary injunction would cause Defendant.  *See Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[I]t is error to dismiss as self-inflicted the harms that might be suffered by a defendant if an injunction were to issue.").

That harm, according to declarations and other evidence submitted by Defendant, would be significant.  Defendant projects

---

[6] Plaintiff also cites this Court's decision in *Science Applications International Corp. v. CACI-Athena, Inc.*, 2008 U.S. Dist. LEXIS 37849, at *10 (E.D. Va. May 8, 2008) in support of its argument that Defendant would not be harmed by an injunction that enforced the terms of the GSA.  In its decision to award a temporary restraining order, *Science Applications* does cite the language in *JTH Tax, Inc.* discussing the balancing test for a permanent injunction.  The Court, though, did not rely solely on that case to find that a TRO would not harm the defendant.  Instead, the Court found that the defendant "would end up roughly in the same place regardless" of whether the Court issued the TRO.  *Id.*

17

that its transient aircraft revenue for the year 2008 is approximately $1,000,000.  *See* David Landow Supp. Decl. at ¶ 36. This figure represents somewhat less than 20 percent of Defendant's revenues – a substantial amount for a company of Defendant's size.  *Id.* at ¶ 37.  Defendant claims that losing this revenue stream would put its $20.7 million primary loan in danger by reducing Defendant's Debt Service Coverage Ratio below the prescribed ratio.  *Id.* at ¶¶ 38-39.  A preliminary injunction would force Defendant to reconfigure its business operation; Defendant also believes that it would have to lay off a significant part of its small staff.[7]  Def.'s Mem. in Opp'n at 28.

If Defendant ultimately prevails on the merits, it could face difficulties in efficiently replacing or rehiring staff members it previously laid off.  Even considering the requirement that a plaintiff post security as a prerequisite to a preliminary injunction, Defendant has outlined a number of harms that would be at least as difficult to quantify as those cited by Plaintiff.  *See* Fed. R. Civ. P. 65(c).  Plaintiff has not alleged that the harm caused by Defendant's allegedly infringing activity threatens the overall financial stability of its business. Defendant, to the contrary, has testified through its declarants

---

[7] Plaintiff claims that it would probably hire some or all of any staff laid off by Defendant.  Bennett 1st Supp. Decl. at ¶ 9.

that a preliminary injunction would severely affect the way it did business and could ultimately threaten the viability of the Dulles Jet Center undertaking.  The Court finds that a preliminary injunction would cause Defendant a significant amount of harm.

   C. Likelihood of Success on the Merits

     The three contracts governing the relevant rights and obligations of Plaintiff at Dulles are the Concession Contract, the Supplemental Agreement, and the GSA.  The contracts grant Plaintiff the exclusive right to act as one of two FBOs at Dulles.  The GSA also explicitly states that Defendant will not compete with Plaintiff as an FBO.  Reading these contracts as a whole, it appears that Plaintiff has some likelihood of success on the merits.  At this preliminary stage, however, Plaintiff's success is by no means guaranteed.  It will depend on the interpretation of a number of contractual provisions, the meaning of which the parties vigorously contest.

     1. The Terms of the Relevant Contracts

     To prevail on its breach of contract claim, Plaintiff must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (citations omitted).  Defendant does not contest the

fact that it has enforceable obligations to Plaintiff.  Instead, it argues that its actions do not violate the GSA.

Plaintiff claims that the plain language of the Concession Contract, the Supplemental Agreement, and the GSA prevents Defendant from servicing transient planes.  Section 3.03 of the Concession Contract between Plaintiff and the MWAA requires Plaintiff to:

> Provide the sale of ramp assistance to all transient aircraft desiring to use the Premises including, but not limited to, hangaring of based and transient aircraft, aircraft lead-in, lead-out and repositioning services; loading and unloading passengers, baggage and cargo; aircraft parking including protective storage and tie-down of based and transient aircraft . . . .

Concession Contract at § 3.03(a)(2).  Plaintiff argues that, along with the provision of fuel, these activities exemplify the services an FBO provides.

The Supplemental Agreement between the MWAA and Plaintiff modified the Concession Contract.  It granted to Plaintiff:

> [T]he exclusive right to furnish [at the Dulles Jet Center] fuel, products, and FBO services provided for under the [Concession Contract] to the Tenant, the Subtenants of the Tenant, and guests, visitors, and invitees of the Tenant and its Subtenants, and customers of [Plaintiff] authorized to use the [Dulles Jet Center].

Supplemental Agreement at § 3.04.  Plaintiff claims that the GSA did not transfer any of its exclusive right to provide FBO services to Defendant.

20

a. <u>The Non-Competition Clause</u>

The terms of the GSA largely support Plaintiff's position.  Under the GSA, which is constrained by the terms and provisions of the Supplemental Agreement,[8] Defendant agreed not to compete with Plaintiff as an FBO.  The non-competition clause of the GSA states that, except for certain "approved uses" of the Dulles Jet Center, "[Defendant] shall not engage in any other use of, or activity at, the [Dulles Jet Center]."  GSA at § 4.1.  "[Defendant] expressly warrants and represents that it shall not, at any time . . . undertake on its own behalf, or cause to be undertaken through any third party . . . the following services at or on the [Dulles Jet Center]: (a) a fixed base operation [that is, an FBO] or facility . . .".  *Id.*

b. <u>"Approved Uses"</u>

The "approved uses" referenced in the non-competition clause are those set out in Article I of the GSA, Sections 3.03 and 3.04 of the Supplemental Agreement, and Article IV of the Supplemental Agreement.  *Id.*  Article I of the GSA allows Defendant to take possession of, and build on, the land subleased to it.  Article I also limits the uses of the Dulles Jet Center, which "shall only be used for the servicing, maintenance, repair, parking, storage and hangaring of aircraft owned and/or operated

---

[8] *See* Supplemental Agreement at § 5.01 ("This [GSA] shall at all times be subject to and contingent upon the terms, conditions and requirements of the Supplemental Agreement.").

by Sublessee and "Sublessee's Representatives" . . . and customers of [Plaintiff], and for ancillary services related thereto."  GSA at § 1.2(a).  "Sublessee's Representatives" is defined as including "Sublessee's Tenants," which include "licensees," as well as Defendant's "employees, contractors, subcontractors, subtenants, agents, and invitees."  *Id.* at § 4.1.

Section 3.03 of the Supplemental Agreement contains limitations on the use of the Dulles Jet Center similar to the limitations in Article I of the GSA.  Under § 3.03, use of the Dulles Jet Center is limited to "servicing, maintenance, repair, parking, hangaring, and storage" – applicable to Defendant, its subtenants, "guests and visitors" of Defendant and its subtenants, "customers of Defendant," and Plaintiff.  "Other than the approved use of the [Dulles Jet Center] as described in this Supplemental Agreement . . . no commercial business or concession shall be operated from the [Dulles Jet Center] other than by the [Plaintiff]."  *Id.*

Section 3.04 of the Supplemental Agreement explicitly grants to Plaintiff "the exclusive right to furnish on the [Dulles Jet Center premises] fuel, products, and FBO services provided for under the [Concession Contract] to [Defendant, its subtenants, and guests, visitors, and invitees]."

Finally, Article IV explains the rights of Defendant and its subtenants.  It provides for the right to quiet enjoyment

22

and the right to operate aircraft, among others.  Except for one
provision, § 4.02, it says nothing about servicing transient
aircraft.  Section 4.02 does allow Defendant to "use its own
mechanics" and "to provide emergency maintenance and service on a
temporary basis to the transient aircraft of guests, visitors and
invitees . . . with whom [Defendant] or Subtenants may elect to
conduct business."  In its Reply Brief, Plaintiff explains that
the inclusion of this language was a business accommodation to
Defendant, which wanted permission for planes visiting Defendant
and its subtenants, and the planes of corporate affiliates of its
subtenants, to be able to come directly to the Dulles Jet Center
for servicing.  Pl.'s Reply at 14; Bennett 1st Supp. Decl. at ¶
5; Farmer 1st Supp. Decl. at Ex. 1.  Defendant contests the
"business accommodation" argument advanced by Plaintiff.  *See*
Nathan Landow Supp. Decl. at ¶¶ 16-17; David Landow Supp. Decl.
at ¶ 13.  Defendant claims that it never limited its right to
service transients to the strictures of any such "business
accommodation."

    2. The GSA Serves as a Limited Waiver of Rights

        Overall, the plain language of the contracts governing
the relationship between Plaintiff and Defendant points to a
general limitation on the activities Defendant can undertake at
the Dulles Jet Center.  One of these limitations comes from the
agreement not to compete with Plaintiff as an FBO.  Another is

structural: the general limitation of Defendant's activities to those that the GSA and the Supplemental Agreement allow.  In other words, the GSA provides a limited waiver of Plaintiff's exclusive rights, and the default position is that Defendant can only do what the GSA allows.

On its face, the GSA does not appear expressly to allow Defendant to service transient planes, which, depending on the precise meaning of "FBO," may be a job reserved to Plaintiff as part of Plaintiff's concession as an FBO.  *See* Concession Contract at § 3.03(a)(2); Supplemental Agreement at § 3.04.  For this reason, Defendant's argument based on the fact that the GSA never explicitly states that Defendant *cannot* service transients is, at this time, unconvincing.  The terms of the GSA do not set limits on Defendant's activities and allow Defendant free rein within those limits.  Instead, the GSA grants Defendant certain rights and those rights only.

3. Likelihood of Success on the Merits

In looking at the contracts as a whole, then, it seems fair to say that Plaintiff has a likelihood of success on the merits of its claim.  At this preliminary stage, however, the Court will not rule out the possibility that Defendant may find shelter in the contested definition of "FBO," the meaning of terms in the GSA like "guests," "invitees," and "customers," or other extrinsic evidence indicating that there may have been some

24

confusion on the part of Plaintiff as to whether Defendant could service its "own" transient customers.  Thus, while the Court finds that there is a likelihood of success on the merits, it will not say that the likelihood, at this preliminary point, is a strong one.

        4. <u>Limitations on the Likelihood of Success</u>

            a. <u>Evidence Outside the Terms of the GSA</u>

A few points about this finding bear mentioning. First, Defendant's contention that the GSA does not define "FBO" in a helpful manner is correct.  The Concession Contract does describe the "primary and secondary commercial support services" that Plaintiff can offer as part of its FBO concession. Concession Contract at ¶ 3.03.  It may be logical to assume that these "services" – which include the handling of transient aircraft – are those provided by FBOs at Dulles.  Defendant, however, was not a party to the Concession Contract.  The extent to which that contract's terms apply directly or in an explanatory fashion remains an open issue.

Second, Defendant has pointed to a number of extra-contractual documents that, it claims, undercut Plaintiff's assertion that it never intended to allow Defendant to service transient aircraft.  Defendant points to several third-party permits it entered into with other airline companies.  It claims that Plaintiff and the MWAA reviewed and approved them.  Several

25

of these permits contain references to things like "non-hangar based . . . aircraft" and "standard transient hangar and ramp fees." Def.'s Mem. in Opp'n at 9. Plaintiff's approval of these permits, Defendant argues, shows that it recognized Defendant's right to service transients. Defendant also states that, in 2005, it sent a letter to Plaintiff's in-house counsel. The letter contained an attached appraisal of the proposed Dulles Jet Center that listed, under the category "Transient Aircraft Overnight Hangaring," a first-year projected revenue of $766,500 – much more than Defendant would be expected to make from hangaring only Plaintiff's "overflow" transients. Defendant argues that none of Plaintiff's employees objected to this appraisal.

Plaintiff and Defendant also dispute the facts pertaining to several pro forma agreements prepared while the parties were discussing the acquisition of the Dulles Jet Center by Plaintiff. Defendant argues that these agreements included revenue estimates for Defendants' handling of transient aircraft. *See* Def.'s Mem. in Opp'n at 11; *but see* Farmer 2d Supp. Decl. at ¶ 7. The import of both the permits – to which Plaintiff was not a party – and the pro formas – which were voluminous spreadsheets of information – is unclear at this time.

Additionally, Defendant points to an e-mail sent by Plaintiff's General Manager, Mike Bennett ("Bennett"), prior to

26

the opening of the Dulles Jet Center.  In the e-mail, Bennett
discusses the potential use of a point-of-sale machine that could
be located at the Dulles Jet Center and used "to process the base
tenant and [Dulles Jet Center] transient customer invoices . . .
.".  Def.'s Mem. in Opp'n, Ex. 7.  The same e-mail refers
separately to "all SFS [i.e., Plaintiff's] transient aircraft."
*Id.*  Bennett admits that he sent the e-mail.  He asserts,
however, that Plaintiff did not intend for the Dulles Jet Center
to handle transients, and so point-of-sale equipment was not
needed at the Center and Plaintiff did not install such
equipment.  Bennett 1st Supp. Decl. at ¶ 8.

Bennett's e-mail – as much as it is belied by the later
actions and statements of Plaintiff's employees – could be read
to show that, at one point, Plaintiff may not have had precisely
the attitude toward Defendant's servicing of transient aircraft
that it now professes.  As the case stands now, the extra-
contractual evidence submitted by Defendant and Plaintiff
contains substantial factual conflicts.  Deciding this case on
the merits may require the admission of conflicting extra-
contractual evidence, and so the Court cannot at this time say
that Plaintiff is certain to prevail.

b. <u>Potential Inconsistencies Within the GSA</u>

The GSA and Supplemental Agreement's references to,
among other terms, "guests," "visitors," "invitees," "licensees,"

and "customers," in naming the persons and entities the GSA allows Defendant to serve, leads to another dispute over contract interpretation whose resolution may require parol or other extra-contractual evidence.  *See, e.g.*, GSA §§ 1.2 and 4.1; Supplemental Agreement §§ 3.01, 3.03, 3.04, 4.02.  If the GSA limited Defendant to serving only the tenant planes based in the Dulles Jet Center, Defendant argues, such words would be unnecessary surplusage.  Plaintiff points out that Defendant's interpretation would create inconsistencies within the contract. It explains that these terms were included as a business accommodation to Defendant, which requested permission to service certain transient aircraft either owned by affiliates or subsidiaries of Defendant's hangar-based tenants[9] or visiting Defendant on business.  *See* Pl.'s Reply at 13-14; Bennett 1st Supp. Decl. at ¶¶ 4, 5, 7.  Here again, Plaintiff and Defendant present materially different facts about the existence of any "business accommodation."  These facts may bear on the interpretation of language regarding "guests," "visitors," "invitees," and "customers" – words that could potentially expand the limitations the GSA places on what services Defendant can provide, and to whom it can provide them.

        For these reasons, Plaintiff's ultimate success on the

_____

        [9] Plaintiff says that Defendant, as an example, requested the ability to directly service transient planes owned by Electric Boat, a subsidiary of General Dynamics, one of Defendant's hangar-based tenants.  Pl.'s Reply at 14.

merits is by no means guaranteed.  While the Court believes that
Plaintiff has made a sufficient showing of a "likelihood of
success" to necessitate a full balance-of-harms analysis, it will
not, at this early stage of the litigation, bind itself to
contractual interpretations more appropriate for later stages of
the litigation.

    D. <u>The Public Interest</u>

        Neither party in this case – which concerns an alleged
breach of contract between two private entities – devoted
significant briefing to the question of the public interest.  For
the purposes of this motion, however, the Court will credit the
MWAA's interpretation of the parties' relationship as providing
some evidence of the public interest.  Virginia and the District
of Columbia created the MWAA, a public regional entity, to
operate local airports.  *Washington-Dulles Transp., Ltd. v.
Metro. Wash. Airports Auth.*, 263 F.3d 371, 373 (4th Cir. 2001).
In a letter to Defendant, the MWAA explained that:

> Dulles Jet Center is primarily intended to be a
> corporate hangar facility . . . . While we understand
> that [Defendant] is allowing transient jets to use the
> Dulles Jet Center ramp, this was not the intent of the
> Supplemental Agreement and [Defendant] should not be
> promoting Dulles Jet Center as an FBO for transient
> aircraft using Dulles Airport. [Plaintiff] and Landmark
> Aviation are the only FBOs at Dulles Airport and it is
> the [MWAA's] intent that these FBOs handle the
> transient general aviation business at Dulles Airport."

Farmer Decl., Ex. 6, at 2.  Without deciding that the MWAA speaks
for the public in all of its communications to the parties, the

Court finds this statement sufficient to support the conclusion
that the only public entity involved in this litigation has
endorsed Plaintiff's interpretation of the contract.  Balanced
against the MWAA's letter is the public's interest in a diverse
marketplace with a number of service providers.  The Court finds
that the public interest slightly favors Plaintiff.

    E. <u>The Four-Factor Test</u>

      In weighing the "balance of harms" and considering the
factors of likelihood of success on the merits and the public
interest, as set out in *Blackwelder* and subsequent controlling
precedent, the Court finds that at this time a preliminary
injunction against Defendant is not necessary to preserve the
*status quo ante litem*.

      Plaintiff has made a showing that some of the harm
Defendant has allegedly caused and continues to cause is
irreparable.  Plaintiff's delay in bringing this lawsuit,
however, weighs against it in the balance of harms.  Balancing
the quantum of harm between the parties, the Court finds that the
threatened harm to Defendant significantly outweighs the
threatened harm to Plaintiff.  Plaintiff has demonstrated
irreparable harm but has not shown that Defendant's actions will
damage it to the same extent that an injunction would injure
Defendant.  Defendant, for its part, has shown that a preliminary
injunction would have an immediate and potentially devastating

effect on the continued viability of its business.  At this stage
– taking into account Plaintiff's delay, which weighs against it
– the balance of harms tips in favor of Defendant by a
significant margin.

Under the Supreme Court's recent decision in *Winter*,
the plaintiff "must establish that . . . the balance of equities
tips in his favor."  *Winter v. Natural Res. Def. Counsel*, __ U.S.
__, 129 S. Ct. 365, 374 (2008) (citations omitted).  Applying
*Winter*, Plaintiff's failure to establish that the balance of
equities tips in its favor ends the matter.

Even under *Blackwelder* and subsequent Fourth Circuit
precedent, Plaintiff is not entitled to a preliminary injunction.
Looking at the "flexible interplay" of all four factors, the
Court finds that the balance of hardships weighing in Defendant's
favor is decisive.  *See Rum Creek Coal Sales, Inc. v. Caperton*,
926 F.2d 353, 359 ("The irreparable harm to the plaintiff and the
harm to the defendant are the two most important factors. . . .
As the balance tips away from the plaintiff, a stronger showing
on the merits is required."); *Blackwelder*, 550 F.2d at 196
(quotation omitted) (discussing the "flexible interplay" of the
factors).  As noted above, Plaintiff has some likelihood of
prevailing, but, given the numerous contested material facts, its
ultimate success is by no means certain.  The public interest, to
the extent that the public has a strong interest in the

31

performance of the GSA, weighs only slightly in favor of Plaintiff.  These factors are not strong enough to overcome the balance of harms weighing strongly in Defendant's favor. Considering all of the relevant factors, the Court will deny Plaintiff's request for a preliminary injunction.

### IV. Conclusion

For the reasons stated above, the Court will deny Plaintiff's Motion for a Preliminary Injunction.  The Court will, however, consider a request by either party for an expedited trial on the merits.

An appropriate Order will issue.


January 14, 2009                        _____/s/_____
Alexandria, Virginia                            James C. Cacheris
                                      UNITED STATES DISTRICT COURT JUDGE