IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

|  |  |  |
|---|---|---|
| SIGNATURE FLIGHT SUPPORT CORPORATION, | ) ) ) |  |
| Plaintiff, | ) ) ) |  |
| v. | ) ) | 1:08cv955 (JCC/TRJ) |
| LANDOW AVIATION LIMITED PARTNERSHIP, | ) ) ) |  |
| Defendant. | ) ) |  |

## M E M O R A N D U M   O P I N I O N

This matter is before the Court on a bench trial which took place pursuant Plaintiff's Amended Complaint alleging a Breach of Contract (Count II) by Defendant.  Plaintiff further requests a Declaratory Judgment (Count I), an Accounting and Disgorgement (Count IV), and a Permanent Injunction (Count V) in the Amended Complaint.  Defendant counterclaimed for a Declaratory Judgment (Counts I and III) regarding, *inter alia*, fuel service standard, location of the taxilane centerline and permit issues.[1]

After throughly reviewing and considering the relevant records and evidence including exhibits, deposition summaries,

---

[1] The Court will not address the claims that have been dismissed previously after either parties' stipulation or Landow's motion for summary judgment.

and observing and evaluating witness testimony at trial, the
Court makes the following findings of fact and conclusions of
law.

## I.  Findings of Fact[2]

1.   Plaintiff Signature Flight Support Corporation
("Signature" or "Plaintiff") is a Delaware corporation and is one
of the two authorized Fixed Base Operator ("FBO") concessions
located at Washington Dulles International Airport ("Dulles" or
"Airport").  (Pl.'s Tr. Ex. ("PTE") 1.)  Landmark Aviation
("Landmark"), formerly known as Piedmont Hawthorne, is the other
FBO located at Dulles.  Signature operates a network of more than
100 FBOs at a number of airports within the United States and
internationally.

2.   Defendant Landow Aviation Limited Partnership
("Landow" or "Defendant") is a Virginia limited partnership
formed to design, construct, own, and operate a service facility
named the Dulles Jet Center (the "Dulles Jet Center" or "DJC").

3.   Landow Aviation, Inc., a Maryland Corporation, is
a general partner of Landow.  Landow Aviation, Inc. has two
principals: Nathan Landow and his son, David Landow.  Both the
Landows are Maryland residents.  David Landow's duties for the

_____

[2] Given the extraordinary length of this particular bench trial and a
large volume of trial exhibits in the record, the Court notes, at the outset,
that if the background and foundational factual matters were not disputed at
trial, the Court will present the factual findings in this Memorandum Opinion
without specific attribution to a particular witness or exhibit.

Landow entities include, among others, handling real estate development and various contract matters.  (Landow at 173:3-21, Sept. 15, 2009.)

4.   In order to operate as an FBO and provide the services as an FBO at Dulles, the Metropolitan Washington Airports Authority ("MWAA") conducts a competitive public procurement process.  Signature and its predecessors have been authorized to be an FBO since the 1960s pursuant to various FBO concession contracts with MWAA.  These contracts are of finite nature and prior to their extension, MWAA solicits competitive bids for the follow-on contracts.

5.   In 1997, after winning the public procurement process, Signature entered into a concession contract for the management and operation of an FBO concession at Dulles ("Concession Contract") with MWAA.  (PTE 1.)  As part of the Concession Contract, Signature renewed its leasehold interest from MWAA for general aviation terminal facilities, hangars, and ramp space at Dulles to provide its FBO services there.  (PTE 1.)

6.   The Concession Contract sets forth the rights, duties and obligations of Signature as an FBO at Dulles.  Under the Concession Contract, Signature is required to provide various products and services as specified therein as an FBO at Dulles.

7.   For example, Section 3.02 of the Concession Contract grants Signature "[t]he right to establish, conduct and operate a full service FBO concession."  Further it states that

3

Signature "shall have the exclusive right . . . to provide the services authorized by" the Concession Contract.  (PTE 1 at § 3.02.)

8.   Under Section 3.03(a)(2) of the Concession Contract, Signature must provide "the sale of ramp assistance [to those] desiring to utilize the Premises including, but not limited to, hangaring of based and transient aircraft, aircraft lead-in, lead-out and repositioning services, loading and unloading passengers, baggage and cargo; aircraft parking including protective storage and tie-down of based and transient aircraft . . . ." (PTE 1 at § 3.03(a)(2).)

9.   Transient aircraft are those that are not permanently based at Dulles but are traveling through Dulles between the beginning and end point of their trip.  (Farmer at 55:15-23, Aug. 31, 2009 A.M.)  An FBO provides a number of services to the transient aircraft market.

10.   MWAA's Minimum Fixed Base Operator Standards ("Minimum Standards"), Exhibit F to the Concession Contract, further expounds Signature's obligation as an FBO at Dulles.  It requires that Signature, as a Class I FBO at Dulles, provide certain Basic Aeronautical Services to transient aircraft at Dulles such as fuel sales, ground handling and customer services, and aircraft and powerplants maintenance.  (PTE 1; Ex. F.)  The Minimum Standards define "ground handling and customer services" to include "aircraft lead-in/lead-out services; aircraft parking

guidance; aircraft tie down and hangar storage; chock management and monitoring engine start-up safety; aircraft repositioning; ground power and oxygen service; de-icing; on-Airport transportation of passengers, crews, and baggage; assistance with the ground transportation and accommodation; landing fee collection . . . ." (PTE 1, Ex. F at 6-7.)

11.   Signature, as an authorized FBO at Dulles, must comply with a set of rules and regulations overseen by MWAA and the Federal Aviation Administration ("FAA").  For example, MWAA requires Signature meet certain operations, security, and safety requirements, such as remaining open 24 hours a day, 7 days per week, with a sufficient number of trained and skilled personnel to provide required services to general aviation aircraft.  (PTE 1; Ex. A at §§ 3.08, 3.10.)

12.   Signature must not delegate the authority MWAA granted to it absent MWAA's approval.  Signature has no authority to create another FBO at Dulles.  (PTE 1 at § 3.05(a).)

13.   Signature assesses various fees and charges to transient aircraft using its FBO at Dulles such as overnight parking fees, handling fees if such aircraft do not purchase fuel, and other additional fees for ancillary services.  (Farmer at 62:1-63:12, Aug. 31, 2009, A.M.)

14.   For the right to be an FBO at Dulles, Signature pays significant amount of concession fees to MWAA.  For example, in 2008, Signature paid over $9 million to MWAA in concession

fees including fees on fuel sales, aircraft parking, and other ancillary services.  (Farmer at 73:15-17, Aug. 31, 2009, A.M.)

15.   Under Section 3.03(b)(7) of the Concession Contract, Signature was granted the option to develop a 19-acre parcel abutting its premises at Dulles for "additional ramp and/or general aviation hangars" in the future.  (PTE 1 at § 3.03(b)(7).)

16.   Due to the temporary closing of the Ronald Reagan Nation Airport to general aviation following the events of September 11, 2001, general aviation traffic and business dramatically increased at Dulles.  Due to this fact, Signature decided to exercise its option to develop the parcel at Dulles. (Farmer at 74:1-22; 75:21-76:16, Aug. 31, 2009, A.M.)  This parcel is later referred to as the "Corporate Hanger Premises" under the Supplemental Agreement executed between MWAA and Signature.  (PTE 9.)

17.   In 2002, Signature was approached by Nathan Landow about the possibility of developing the parcel for corporate hanger facilities.  In the same year, Signature and Landow executed a Letter of Intent to develop corporate hanger facilities and related facilities.  These facilities are later referred to as the "Dulles Jet Center" or "DJC."  (Farmer at 74:14-76:16, Aug. 31, 2009 A.M.)

18.   On October 7, 2004, Signature signed a "Supplemental Agreement Between MWAA and Signature for the

6

Development of Corporate Hanger Facilities at Washington Dulles International Airport" ("Supplemental Agreement" or the "SA"). (PTE 9.)  The Supplemental Agreement was negotiated mainly between MWAA and David and Nathan Landow with Signature's input from John Cy Farmer ("Farmer") who was then-Signature's Vice President and Signature's general counsel, Claire Margaret Groover.  (Cameron at 95:6-96:3, Sep. 1, 2009; Landow at 174:4-12, Sep. 15, 2009 P.M..)  On behalf of MWAA, Rochelle Cameron ("Cameron") negotiated, executed and ratified the Supplemental Agreement.

19.  With MWAA's approval, Signature and Landow entered into a Ground Sublease Agreement ("GSA") dated April 15, 2004 under which Signature sublet the Corporate Hangar Premises to Landow.  Even though the GSA was executed before the execution of the Supplemental Agreement, the GSA did not become effective until the full ratification of the Supplemental Agreement.  The GSA was signed by Elizabeth Haskins ("Haskins"), the former President of Signature, and Nathan Landow.  (PTE 7.)  Signature's purpose in executing the GSA was to increase its fuel sales and to alleviate the overflow of transient aircraft situation that it was experiencing.  (Farmer at 75:18-76:16, Aug. 31, 2009 A.M.)

20.  During these contract negotiations in early 2004, according to Farmer's unrebutted testimony, in a meeting that took place in a Signature's conference room, Nathan Landow requested that DJC be allowed to service and solicit transient

aircraft.  Farmer informed Nathan Landow that Signature's intent was never to allow Landow to do so.  (Farmer at 87:3-19, Aug. 31, 2009 A.M.).[3]

21.  Importantly, Nathan Landow's own handwritten memorandum, written on memorandum paper "from the Desk of David Landow" specifically stated, among other things, "no transient will be considered a Landow customer," and "Hangar and ramp based customers under lease are Landow customers."  (PTE 213.)

22.  In early October 2004, Signature management and Nathan Landow attended a dinner meeting at the NBAA convention in Las Vegas.  At that dinner meeting, Nathan Landow expressed his interest in growing the transient business at Dulles. Signature's Haskins expressly told Nathan Landow at that meeting that Landow would not be permitted to handle the transient market at Dulles and that it was a "deal breaker."  Nathan Landow agreed that he would not do so.  (Farmer at 87:21-88:14, Aug. 31, 2009 A.M.; Haskins at 66:1-67:25, Sept. 3, 2009 A.M.)

23.  The Supplemental Agreement prohibits Landow from providing services provided by "concessionaires or other contractors under contract with" MWAA.  (PTE 9 at § 3.03(c).) Landmark and Signature are the only authorized FBO

---

[3] Nathan Landow did not choose to testify nor was he subpoenaed to testify by Signature.  The Court will not draw an adverse inference from his silence.  The Court notes, however, that it credits and believes the unrebutted testimony of Farmer regarding parties' behavior during these negotiations.

concessionaires at Dulles.  Also, the Supplemental Agreement
excuses Landow from paying a concession fee for its own aircraft,
aircraft owned by its tenants and the "guests and visitors" of
either Landow or its tenants.  (PTE 9 at § 5.04(a).)  According
to Cameron, MWAA did not intend for Section 5.04(a) of the
Supplemental Agreement to grant Landow the right to solicit and
service transient aircraft without collecting applicable fees
from them and remitting part of those fees to MWAA. (Cameron at
103:12-104:12, Sept. 1, 2009.)

24.   Under Sections 4.1 and 4.1(a) of the GSA, Landow
"expressly warrants and represents that it shall not, at any time
. . . undertake . . . to provide . . . the services of a fixed
base operation or facility" on the DJC premises.  (PTE 7.)

25.   Signature has the right under the GSA to refer
transient aircraft wishing to hangar their aircraft overnight to
DJC and to park overflow traffic on DJC's ramp.  (PTE 7, §10.2;
§ 26.1.)

26.   In the spring of 2005, Landow began construction
of the Dulles Jet Center.  The construction loan application to
SunTrust Bank for the site development and construction of the
Dulles Jet Center was approximately for $23 million.  (PTE 23, p.
1, and Ex. A.)

27.   Landow spent in excess of $37 million, which is
more than 50% over the originally-budgeted amount, to build the
Dulles Jet Center.  (PTE 112; Landow at 35:1-9, Sept. 16, 2009.)

28.   DJC opened in October of 2006.  Prior to the opening while the construction of DJC was still underway, Nathan Landow tried to sell DJC to both Landmark and to Signature.  (PTE 43.)  According to the unrebutted testimony of Farmer, Nathan Landow flew to Florida to meet with Farmer over lunch.  During this lunch, Nathan Landow inquired whether Signature would be interested in acquiring the Dulles Jet Center.  At that meeting, Landow acknowledged to Farmer that he has made a bad deal in negotiating these contracts, has spent too much money in constructing DJC, and was looking for a possible way to get out of the business.  (Farmer at 5:6-6:12, Aug. 31, 2009 P.M.)  Specifically, Nathan Landow told Farmer:  "If you can make this happen, I'll make it worth your while."  Farmer understood Nathan Landow's offer to be a bribery and did not accept this offer. (Farmer at 6:16-7:14, Aug. 31, 2009 P.M.)

29.   After DJC opened in October 2006, Signature began losing some of its transient customers to the Dulles Jet Center such as Dow Chemical, Eli Lily, and Black & Decker.  (Bennett at 93:19-95:6, Sept. 2, 2009 A.M.; Farmer at 26:13-27:18, Aug. 31, 2009 P.M.);(PTE 67; 210.)

30.   On October 25, 2006, Signature's Farmer and Michael Bennett ("Bennett"), Vice President of Signature, met with Nathan and David Landow to discuss the transient aircraft issues.  During this meeting, Farmer told them that DJC was not supposed to be servicing the transient aircraft market at Dulles,

informed them this was not the intent of the agreement, and requested DJC to stop soliciting Signature's transient clients. (Farmer at 27:23-29:13, Aug. 31, 2009 P.M.); (Bennett at 5:2-6:19, Sept. 2, 2009, P.M.)

31.  At that meeting, Nathan Landow requested a change in the terms of the deal that Landow previously formed with Signature by increasing the revenue Landow would be permitted to keep from Signature's overflow parking and cutting MWAA completely out of its entitlement, which is 40% of those revenues.  (Farmer at 29:14-30:7, Aug. 31, 2009 P.M.); (PTE 55.) On October 31, 2006, Nathan Landow confirmed in an e-mail that these were his requested changes.  (PTE 61.)

32.  On December 6, 2006, Signature's General Counsel, Joseph Goldstein sent a demand notice asking Landow to cease and desist from acting or performing as an FBO and driving revenues from the transient market at Dulles.  Signature cited in this letter excerpts from several articles that suggested Landow was acting as a third FBO at Dulles.  (PTE 68.)  In response to Landow's demand for mediation, Signature again sent a letter to Landow setting forth its position on transients on January 2, 2007.  (PTE 71.)  Signature and Landow engaged in a formal mediation process with respect to the transient issue and other related issues.

33.  DJC offers ground handling, taxiing, towing, ramp assistance, ground power units, baggage handling, passenger

assistance, ground transportation, rental car services, and catering.  (Meeusen at 13:16-15:3, Sept. 3, 2009 A.M.); (PTE 220.)  Such services are among those Signature shall and may provide to the transient aircraft market at Dulles under the Concession Contract and the Supplemental Agreement under the Concession Contract and the Supplemental Agreement.

34.  According to Bennett, the number of transient aircraft traveling directly to DJC and bypassing Signature's ramp was between 8 and 10 per day in late 2008 and early 2009. (Bennett at 99:15-20, Sept. 2, 2009 A.M.)  Signature contends it loses revenue from parking fees and handling charges when these transient aircraft bypass Signature's FBO.  (Bennett at 107:6-13, Sept 2, 2009 A.M.)

35.  Landow refused to allow Signature to park overflow traffic on the Dulles Jet Center's ramp with no justification even though it has obligation to make its ramp available to Signature for overflow parking.  (PTE 7 at § 10.2);(Bennett at 33:23-35:2, Sept. 2, 2009 P.M.)

36.  Landow is holding DJC out to general aviation community as an FBO.  (PTE. 139.)  When speaking to potential customers, DJC employees often refer to itself as an FBO.  (PTE 105, 132, 186.)  For example, DJC employees represented to its customers or potential customers that "besides fuel, [DJC] provide[s] all other services an FBO provides" and that it "is

12

the only FBO in the DC area that offers transit [sic] hangar space."  (PTE 132; 270.)

37.  DJC advertised itself as the "newest FBO" at Dulles in the United Airlines lounges at Dulles and Chicago's O'Hare International Airport.  (PTE 171.)  Nathan Landow requested and approved these advertisements.  (Meeusen at 40:24-42:10, Sept. 3, 2009, A.M.)  Landow also advertised DJC in the 2009 AC-U-KWICK FBO Guide, the national guide for FBOs used by pilots, and on numerous websites that are directed to the transient aircraft market such as Fltpln.com and Airnav.com. (PTE 83, 162, 177, 183, 207, 246, 257, 272); (Farmer at 49:18-52:6, Aug. 31, 2009 P.M.); (Bennett at 7:1-8:12, Sept. 2, 2009 P.M.)

38.  In 2008, Landow launched a "Break Away From Signature Campaign" so that Landow can gain fueling rights at DJC. (PTE 117; 162; 273(l).)  The GSA gives Landow right to petition MWAA for its own fueling rights if it could demonstrate that Signature's fueling services was provided in an acceptable manner. (PTE 7 at § 4.2(a).)  As part of that campaign, Landow met with MWAA Vice President and Airport Manager at Dulles, Chris Browne ("Browne") and his staff, and sent a letter in support of its position on June 3, 2008.  (PTE 137, 162.)

39.  At Landow's request, MWAA commenced a review and an investigation regarding Signature's allegedly inadequate fuel service.  When MWAA requested Signature to respond to Landow's allegations against it, Signature responded that DJC's argument

13

was misplaced because DJC was handling the volume of transient traffic that it was not supposed to handle.  Signature pointed out that DJC was not an FBO and the right to handle and service the transient market were reserved for FBOs.  (PTE 178 (pp. 2-4; 15-16)).

40.  After the investigation, MWAA found that evidence was insufficient to conclude that Signature violated its fuel service agreement.  (PTE 187A.)  In August, 2008, MWAA's Browne issued a letter ruling the following:

> Dulles Jet Center is primarily intended to be a corporate hangar facility, providing hangar space and services for corporations who base their jets at Dulles Jet Center . . . . Landow should not be promoting Dulles Jet Center as an FBO for transient aircraft using Dulles Airport.  Signature and Landmark Aviation are the only FBOs at Dulles Airport and it is the Authority's intent that these FBOs handle the transient general aviation business at Dulles Airport.  We expect Landow's primary focus to be on leasing space to corporations to house their jets at Dulles Airport and providing services to those tenants.

(PTE 187A.)

41.  In response, Landow informed MWAA via letter on September 2, 2008 that it would abide by MWAA's interpretation but has failed to do so.  (PTE 192.)

42.  Even after receiving MWAA's August, 2008 letter regarding DJC's status as a non-FBO at Dulles, Landow made several requests to MWAA seeking to serve as a *de facto* FBO.  For example, Landow sought an additional signage at Dulles and additional aircraft parking area during the Presidential

14

Inauguration activities, and asked to be added to MWAA's website under the FBO heading with the other FBOs at Dulles, all made after Browne's letter to Landow articulating MWAA's position. (PTE 193, 194.)

43.  On September 8, 2008, MWAA's Browne denied these requests by Landow because DJC is not an FBO and only Signature and Landmark have been approved to provide FBO services to transient aircraft at Dulles.  (PTE 194.)

44.  MWAA's position, as evidenced by unrebutted testimony of Cameron and Browne, is that it was never MWAA's intent to allow Landow to handle and service the transient aircraft market at Dulles.  (Cameron at 94:15-95:4; 116:23-117:6; 183:4-25, Sept. 1, 2009);(Browne at 210:1-8; 210:14-16; 221:10-19; 231:15-233:23; 246:17-248:1; 298:22-300:14, Sept. 1, 2009.)

45.  Signature's existing lease with MWAA is set to expire in 2012, at which time Landow may compete for FBO rights at Dulles.

## II. Analysis

The Court first addresses the merits of Plaintiff's claims of Breach of Contract, Declaratory Judgment, Accounting and Disgorgement, and Permanent Injunction.  The Court will then address the merits of Defendant's counterclaims against Plaintiff seeking certain Declaratory Judgments.

A.  Count II: Breach of Contract

15

Signature alleges that Landow has breached the GSA by soliciting and servicing transient aircraft, earning revenue from such prohibited activities, and acting as and holding itself out as an FBO.  Defendant Landow submits that, even though it has enforceable obligations to Plaintiff under the GSA, its actions do not violate the GSA.

To succeed on its breach of contract claim, Plaintiff must show: "(1) a legally enforceable obligation of a defendant to a plaintiff; (2) the defendant's violation or breach of that obligation; and (3) injury or damage to the plaintiff caused by the breach of obligation." *Filak v. George*, 594 S.E.2d 610, 614 (Va. 2004) (citations omitted).

1.  <u>Legally Enforceable Obligation</u>

The Court first addresses whether Landow had any legally enforceable obligation to Signature.  In Virginia, it is well established that restrictive covenants regarding the use of land are not favored and strictly construed against the party seeking the enforcement.  *Dart Drug Corp. V. Nicholakos*, 277 S.E.2d 155, 157 (1981) (internal citation omitted).  "Substantial doubt or ambiguity is to be resolved against the restrictions and in favor of the free use of property." *Friedberg v. Riverpoint Bldg. Comm.,* 239 S.E.2d 106, 110 (Va. 1977) (citations omitted).  "However, when the terms of a restrictive covenant are clear and unambiguous, the language used will be taken in its ordinary

signification, and the plain meaning will be ascribed to it." *Barris v. Keswick Homes*, *L.L.C.,* 597 S.E.2d 54, 57 (Va. 2004) (citing *Marriott Corp. v. Combined Properties, L.P.*, 391 S.E.2d 313, 316 (Va. 1990); *Foods First, Inc. v. Gables Associates*, 418 S.E.2d 888, 889 (Va. 1992)).  "The guiding light . . . is the intention of the parties as expressed by them in the words they have used, and courts are bound to say that the parties intended what the written instrument plainly declares." *Golding v. Floyd*, 539 S.E.2d 735, 737 (Va. 2001) (citing *Magann Corp. v. Electrical Works*, 123 S.E.2d 377, 381 (Va. 1962)).  "Parol evidence of prior or contemporaneous oral negotiations are generally inadmissible to alter, contradict, or explain the terms of a written instrument provided the document is complete, unambiguous, and unconditional." *Renner Plumbing, Heating & Air Conditioning, Inc. v. Renner*, 303 S.E.2d 894, 898 (Va. 1983).

The question of whether the language of a contract is ambiguous is a question of law and the Court's job is "to construe the contract made by the parties, not to make a contract for them." *Doswell Ltd. P'ship v. Virginia Elec. and Power Co.,* 468 S.E.2d 84, 88 (Va. 1996) (citation omitted).  "An ambiguity exists when language admits of being understood in more than one way or refers to two or more things at the same time." *Renner Plumbing, Heating & Air Conditioning, Inc.,* 303 S.E.2d at 898. The Court will not render contracts ambiguous "merely because the

parties or their attorneys disagree upon the meaning of the language employed to express the agreement." *Doswell Ltd. P'ship*, 468 S.E.2d at 88. "Even though an agreement may have been drawn unartfully, the court must construe the language as written if its parts can be read together without conflict." *Id.* (citing *Berry v. Klinger*, 300 S.E.2d 792, 796 (Va. 1983)). The Court gathers the meaning of the language of a contract "from all its associated parts assembled as the unitary expression of the agreement of the parties." *Berry*, 300 S.E.2d at 796.

Both parties submit there exists no ambiguity in the relevant contract language and ask the Court to construe the unambiguous terms of the contract at issue according to their plain meaning. Upon consideration of the Virginia's well-established legal principles regarding contract interpretation and the contract terms contained in the relevant contracts at issue, the Court agrees with the parties that the relevant languages of the GSA, Supplemental Agreement and the Concession Contract provisions are not ambiguous and clearly restrict Defendant from provision of services of an FBO and service of the general transient market. Additionally, because "it is apparent from a reading of the whole instrument that the restrictions carry a certain meaning by definite and necessary implication, then the thing denied may be said to be clearly forbidden, as if the language had been in positive terms of express inhibition."

*Bauer v. Harn*, 286 S.E.2d 192, 196 (Va. 1982) (citing *Friedberg v. Building Committee*, 239 S.E.2d 106, 110 (1977)).

The three contracts governing the relevant rights and obligations of Plaintiff at Dulles are the Concession Contract, the Supplemental Agreement, and the GSA.  While Defendant is a party to the GSA only, it is nonetheless subject to certain terms and duties imposed on it by the Concession Contract and the Supplemental Agreement by implication.  For example, the terms of the GSA is constrained by the terms and provisions of the Supplemental Agreement.  (PTE 7 at § 5.01 ("This [GSA] shall at all times be subject to and contingent upon the terms, conditions and requirements of the Supplemental Agreement . . .  If there is any conflict or inconsistency between the terms and conditions of the [GSA] and those of the Supplemental Agreement, the Supplemental Agreement shall control.")  Plaintiff claims that, interpreted as a whole, the plain language of the Concession Contract, the Supplemental Agreement, and the GSA prohibits Defendant from providing the services of an FBO or servicing the general transient aircraft market at Dulles.  The Court agrees.

a.  Non-Competition Clause:  Services of an "FBO"

Section 4.1 of the GSA, the non-competition provision, provides, that Landow, except for certain "approved uses" of the Dulles Jet Center, "shall not engage in any other use of, activity at, the [Dulles Jet Center]."  (PTE 7 at § 4.1.)

19

Further, it provides that "[Defendant] expressly warrants and represents that it shall not, at any time . . . undertake on its own behalf, or cause to be undertaken through any third party . . . the following *services* at or on the [Dulles Jet Center]: (a) a fixed base operation [that is, an FBO] or facility . . ." (PTE 7 at § 4.1.) (emphasis added). "Approved uses" referenced in the non-competition clause above are those set out in Article I of the GSA, Sections 3.03 and 3.04 of the Supplemental Agreement, and Article IV of the Supplemental Agreement. (PTE 7.)

Plaintiff claims that the GSA did not transfer to Defendant any of its exclusive right to provide FBO services according to the plain language of Section 4.1 of the GSA and related sections of the Supplemental Agreement. Defendant contends that it is not violating Section 4.1(a) of the GSA because the Dulles Jet Center is not an FBO. Defendant submits that DJC is not technically an FBO because one must sell fuel to be an FBO, and DJC does not and cannot sell fuel. Landow's expert witness, Eric Smith, an attorney specializing in part in aviation law and representation of airports, testified that the core FBO services at major airports such as Dulles should include fueling. (Smith at 68:19, Sept. 3, 2009 P.M.)

The Court acknowledges that nowhere in the GSA or Supplemental Agreement is the term "fixed based operation,"

"fixed based facility," "fixed based operator," or "FBO" defined. However, the main issue in this case is not whether Landow fits the technical definition of an FBO, but whether Landow may provide services provided by an FBO in violation of Section 4.1(a) of the GSA.  Section 3.3 of the Concession Contract expounds the "primary and secondary commercial support services" that Signature can offer as part of its FBO concession.  (PTE 1 at § 3.03.)  Section 3.03 requires Plaintiff to:

> Provide the sale of ramp assistance to all transient aircraft desiring to use the Premises including, but not limited to, hangaring of based and transient aircraft, aircraft lead-in, lead-out and repositioning services; loading and unloading passengers, baggage and cargo; aircraft parking including protective storage and tie-down of based and transient aircraft . . . .

(PTE 1 at § 3.03(a)(2).)  Thus, along with the provision of fuel, these activities identified in Section 3.3 of the Concession Contract exemplify the typical services an FBO provides.  Though Defendant was not a party to the Concession Contract, the Court holds that reading of the relevant contracts as a whole, in an explanatory fashion as laid out below, based on the plain meaning of the terms of the contracts, is permissible and reasonable. *See Pocahontas Mining LLC v. CNX Gas Co., LLC*, 666 S.E. 2d 527, 531 (Va. 2008).

First, Section 5.1 of the GSA provides that "[a]ll of the terms, provisions, covenants . . . in the Supplemental Agreement are hereby made a part of this [GSA] except as

21

otherwise herein provided." (PTE 7 at § 5.1.) Thus, the Court is allowed to review the terms of the Supplemental Agreement to the extent that they may be applicable in its effort to interpret Section 4.1 of the GSA. Section 3.04 of the Supplemental Agreement, which modified the Concession Contract, grants Signature:

> [T]he exclusive right to furnish [at the Dulles Jet Center] fuel, products, *and* FBO services provided for under the [Concession Contract] to the Tenant, the Subtenants of the Tenant, and guests, visitors, and invitees of the Tenant and its Subtenants, and customers of [Plaintiff] authorized to use the [Dulles Jet Center].

(PTE 9 at § 3.04.) (emphasis added). Based on the reading of this Section, using the plain meaning of the terms included therein, the Court concludes that Signature has exclusive right to furnish not only fuel but also all other FBO services at Dulles. Holding otherwise would render the terms of Section 3.04 meaningless and redundant. *Pocahontas Mining*, 666 S.E.2d at 531. This interpretation is further supported by the plain language and structure of Section 4.1 of the GSA. Section 4.1 expressly and separately sets out prohibition on fueling and de-icing service under subsections (d) and (e), respectively, in addition to the prohibition in subsection (a) regarding FBO services. (PTE 7 at §§ 4.1(a),(d),(e).) Thus, Defendant's argument that it is not violating Section 4.1(a) of the GSA so long as it does not sell fuel and de-icing service is unavailing.

Section 3.04 of the SA refers to "FBO services provided for under the [Concession Contract]" when describing Signature's exclusive right.  (PTE 9 at § 3.04.)  Section 3.03 of the Concession Contract as well as Exhibit F to the Concession Contract specifically describe many ground handling and customer services such as aircraft lead-in, lead-out and repositioning services, tie down and hangar storage, chock management, loading and unloading passengers, baggage and cargo, aircraft parking including protective storage, and tie-down of based and transient aircraft, to be core FBO services.  (PTE 1 at § 3.03).  Accordingly, the Court holds that Landow's provision of any and all FBO services, as described in the relevant contracts, is in violation of Section 4.1(a) of the GSA.

### b.  Acting or Holding DJC out as an "FBO"

Plaintiff contends that Defendant is violating Section 4.1 of the GSA by holding itself out and acting as an FBO.  Defendant, in response, argues that because there is no express provision in Section 4.1 of the GSA that prohibits Landow from holding itself out as an FBO or acting as an FBO, there is no specific duty to not act or hold DJC out as an FBO, and that the Court must not expand the scope of a non-competition covenant to include what is not explicitly set forth there.  *Food First, Inc*. 418 S.E.2d at 890.  The Court rejects Defendant's argument.

The plain language of the contracts governing the
relationship between Plaintiff and Defendant points to a general
limitation on the activities Defendant can undertake at the
Dulles Jet Center.  (*See* PTE 7 at § 4.01.)   One of these
limitations comes from the agreement not to compete with
Plaintiff as an FBO.  Another is structural: the general
limitation of Defendant's activities to those that the GSA and
the Supplemental Agreement allow.  In other words, the GSA
provides a limited waiver of Plaintiff's exclusive rights, and
the default position is that Defendant can only do what the GSA
allows.  Simply, the GSA grants Defendant certain rights and
those rights only.  For this reason, Defendant's argument based
on the fact that the GSA never explicitly states that Defendant
cannot act or hold itself out as an FBO is unpersuasive.

    c.   Transient Aircraft Market and "Guests,"
"Visitors," "Invitees," "Licensees" and "Customers"

Defendant argues that, based on the GSA and
Supplemental Agreement's references to, among other terms,
"guests," "visitors," "invitees," "licensees," and "customers,"
in naming the persons and entities the GSA allows Defendant to
serve, it has the right to service the general transient aircraft
market at Dulles.  *See, e.g.,* (PTE 7 at §§ 1.2 and 4.1; PTE 9 at
§§ 3.01, 3.03, 3.04, 4.02.)  If the GSA limits Defendant to serve
only the tenant planes based in the Dulles Jet Center, Defendant
argues, such words would be unnecessary surplusage.  Plaintiff

contends that Defendant's interpretation that it can serve general transient aircraft market would create impermissible inconsistencies within the contract.  The Court agrees with Plaintiff.

The parties sharply dispute the scope of rights granted to Defendant regarding service to and solicitation of general transient aircraft market based on the meaning of the terms "guests," "visitors," "invitees," "licensees," and "customers," in the GSA and SA.  The Court will not render the relevant agreements unambiguous on this basis alone.  *Westmoreland-LG&E Partners v. Virginia Elec. and Power Co.*, 486 S.E.2d 289, 294 (Va. 1997) ("[c]ontracts are not [to be] rendered ambiguous merely because the parties or their attorneys disagree upon the meaning of the language employed to express the agreement.")

As explained *supra*, a contract is ambiguous "when the contract's language is of doubtful import, is susceptible of being understood in more than one way or of having more than one meaning, or refers to two or more things at the same time." *Pocahontas Min. Ltd. Liability*, 666 S.E.2d at 531 (citing *Video Zone, Inc. v. KF & F Props., L.C.,* 594 S.E.2d 921, 923 (Va. 2004).  To determine whether disputed contractual terms are ambiguous, the Court considers the words employed in accordance with their usual, ordinary, and popular meaning.  *Id.* (citations omitted).

25

Upon consideration of the usual, ordinary and popular meaning of the terms "guests," "visitors," "invitees," "licensees," and "customers"[4] and how these terms are used in the different provision of the GSA and SA, the Court concludes that the relevant contracts are not ambiguous with regard to Signature's exclusive right to service the general transient aircraft market.  Even though the terms "guests," "visitors," "invitees," "licensees," and "customers" are not defined specifically in the relevant contracts, when read as a whole, they cannot be understood to have more than one meaning. *Doswell*, 468 S.E.2d at 88.  They describe a sub-set of entities to whom DJC may provide limited services as defined by the GSA, the Supplemental Agreement and the Concession Contract.  Because the relevant terms of the contracts at issue are clear and unambiguous, the Court next explores, without the use of parol or extrinsic evidence, whether the plain language of the contracts, allows Landow to serve the general transient market at Dulles without any limitations.

Section 4.1 of the GSA provides that Landow "shall not engage in any other use of, activity at, the [Dulles Jet Center]"

---

[4] According to Black's Law Dictionary (8th ed. 2004), a "guest" is "a person who is entertained or to whom hospitality is extended"; a "visitor" is a person who goes or comes to a particular person or place; "invitee" is a person who has an express or implied invitation to enter or use another's premises, such as a business visitor or a member of the public to whom the premises are held open; a "licensee" is one who has permission to enter or use another's premises, but only for one's own purposes and not for the occupier's benefit.  Merriam Webster Online defines the term "customer" as one that purchases a commodity or service.

except for certain "approved uses" of the Dulles Jet Center.
(PTE 7 at § 4.1.)  The "approved uses" referenced in the non-
competition clause are those set out in Article I of the GSA,
Sections 3.03 and 3.04 of the Supplemental Agreement, and Article
IV of the Supplemental Agreement.  *Id.*

Article I of the GSA allows Defendant to take
possession of, and build on, the land subleased to it.  Article I
also limits the uses of the Dulles Jet Center, which "shall only
be used for the servicing, maintenance, repair, parking, storage
and hangaring of aircraft owned and/or operated by Sublessee and
"Sublessee's Representatives" . . . and customers of [Plaintiff],
and for ancillary services related thereto."  (PTE 7 at
§ 1.2(a).)  "Sublessee's Representatives" is defined as including
"Sublessee's Tenants," which include "licensees," as well as
Defendant's "employees, contractors, subcontractors, subtenants,
agents, and invitees."  (PTE 7 at § 4.1.)

Section 3.03 of the Supplemental Agreement contains
limitations on the use of the Dulles Jet Center similar to the
limitations in Article I of the GSA.  (PTE 9 at § 3.03.)  Under
§ 3.03, use of the Dulles Jet Center is limited to "servicing,
maintenance, repair, parking, hangaring, and storage" –
applicable to Defendant, its subtenants, "guests and visitors" of
Defendant and its subtenants, "customers of Defendant," and
Plaintiff.  "Other than the approved use of the [Dulles Jet
Center] as described in this Supplemental Agreement . . . no

27

commercial business or concession shall be operated from the [Dulles Jet Center] other than by the [Plaintiff]." *Id.*

Section 3.04 of the Supplemental Agreement explicitly grants to Plaintiff "the exclusive right to furnish on the [Dulles Jet Center premises] fuel, products, and FBO services provided for under the [Concession Contract] to [Defendant, its subtenants, and guests, visitors, and invitees]." (PTE 9 at § 3.04.) Section 3.03 of the Concession Contract provides that "the sale of ramp assistance to all *transient aircraft*" is one of the FBO services Signature may provide exclusively. (PTE 1 at § 3.03(b).) (emphasis added).

Finally, Article IV of the Supplemental Agreement explains the rights of Defendant and subtenants of Defendant. (PTE 9 at Art. IV.) It provides, *inter alia*, for the right to quiet enjoyment and the right to operate aircraft. Except for Section 4.02, Article IV says nothing about servicing transient aircraft. *Id.* Section 4.02 does allow Defendant to "use its own mechanics" and "to provide emergency maintenance and service on a temporary basis to the transient aircraft of guests, visitors and invitees . . . with whom [Defendant] or Subtenants may elect to conduct business." (PTE 9 at § 4.02.)

Defendant claims that the terms "guests," "visitors," "invitees," "licensees," and "customers" in the GSA and SA permit Defendant to provide servicing, maintenance, repair, parking,

hangaring, and storage to <u>all</u> transient aircraft.  Its argument,
in essence, is that the plain meaning of the terms "guests,"
"visitors," "invitees," "licensees," and "customers" as used in
the different provisions of the GSA and SA all mean the same
thing – business "customers" of Landow.  Defendant argues that
since the plain meaning of the term "customer" is "a person or
entity which buys goods and services from a shop or a business,"
a customer of Landow or of its subtenants is <u>any</u> person or entity
which buys goods or services from either – all transients.  The
Court rejects Defendant's suggested construction for the
following reasons.

When interpreting any part of a contract, this Court
must construe the contract as a whole.  *Lansdowne Dev. Co. v.
Xerox Realty*, 514 S.E.2d 157, 161 (Va. 1999); *Vega v. Chattan
Assoc.*, 435 S.E.2d 142, 143 (1993).  "In reviewing the agreement,
[the Court] must gather the intent of the parties and the meaning
of the language . . . from an examination of the *entire*
instrument, giving full effect to the words the parties actually
used."  *Layne v. Henderson*, 351 S.E.2d 18, 22 (Va. 1986)
(emphasis added).  "No word or clause in the contract will be
treated as meaningless if a reasonable meaning can be given to
it, and there is a presumption that the parties have not used
words needlessly."  *D.C. McClain, Inc. v. Arlington County*, 452
S.E.2d 659, 662 (1995).

29

Guided by these principles, the Court holds that the terms "guests," "visitors," "invitees," "licensees," and "customers," as used in the applicable sections of the GSA and SA (PTE 7 at §§ 1.2 and 4.1; PTE 9 §§ 3.01, 3.03, 3.04, 4.02), do not mean the same thing nor were they used to refer to the entire general transient aircraft market based on the Court's careful reading of the contracts.  Article 37 of the GSA defines the term "Transient Aircraft."  (PTE 7.)  The fact that the term "Transient Aircraft," which is clearly defined in another section of the GSA, was not used in Sections 1.2 and 4.1 of the GSA and Sections 3.03 and 3.04 of the Supplemental Agreement is telling. The Court does not believe that the terms "guests," "visitors," "invitees," "licensees," and "customers," were used needlessly. The reasonable meaning to these terms can be given as the limited sub-set of transient aircraft authorized to use DJC for specific business purposes.  *D.C. McClain, Inc. v. Arlington County*, 452 S.E.2d 659, 662 (1995).

This conclusion is bolstered by the Court's reading of the GSA and SA, which gives full effect of the words used in these contracts.  The Court explained in Part A.1.b, *supra,* that the plain language of the contracts governing the relationship between Plaintiff and Defendant suggests a general limitation on Defendant's activities at Dulles and that they must be limited to those which the GSA and Supplemental Agreement specifically

30

permit.  Thus, the Court finds unconvincing Defendant's argument that it may serve the general transient market because the GSA never explicitly states so.  The terms of the GSA do not set limits on Defendant's activities and allow Defendant free rein within those limits.  Instead, the GSA grants Defendant certain rights and those rights alone.

When construing a contract, the Court must ascertain the intention of the parties from the entire instrument, as expressed in or fairly implied in the writing.  *Bott v. N. Snellenburg & Co.*, 14 S.E.2d 372, 374 (Va. 1941).  The Court's job is to take into consideration and reconcile all the provisions of a contract, if possible, so that the true intent of the parties may be ascertained.  *Id.* at 374; *Justice v. Stuyvesant Ins. Co.*, 265 F.Supp. 63, 65 (W.D. Va. 1967) ("A desire to effectuate the intentions of the parties creates the necessity of looking to the constituent elements of the contract, elucidating one by the other and reconciling them, if practicable, to one common intent or design present to the minds of the contracting parties.")

A few provisions from the Concession Contract and Supplemental Agreement are worth noting to effectuate the parties' intention regarding Defendant's right to service the general transient market.  The GSA does not appear expressly to allow Defendant to service transient aircraft but rather

31

preserves such right to Plaintiff as part of Plaintiff's concession as an FBO.  *See* (PTE 1 at § 3.03(a)(2); PTE 9 at § 3.04.)  Additionally, Section 3.03(c) of the Supplemental Agreement explicitly prohibits Landow from providing services that are "provided or reserved to be provided by concessionaires or other contractors under contract with" MWAA.  (PTE 9 at § 3.03(c)).  It is undisputed that Landmark and Signature are the only authorized FBO concessionaires at Dulles.

Lastly, Section 5.04(a) of the Supplemental Agreement excuses Landow from having to pay a concession fee for its own aircraft, aircraft owned by its tenants, and the "guests and visitors" of either Landow or its tenants.  (PTE 9 at § 5.04(a).) If "guests and visitors" mean the same thing as "customers", meaning all transient aircraft as contended by Landow, an unintended and absurd result would occur: Landow would not have to pay concession fees to MWAA for the very same services for which Signature and Landmark are required to pay concession fees to MWAA.  Thus, reconciling and harmonizing the above identified provisions with the provisions that utilize the terms "guests," "visitors," "invitees," "licensees," and "customers" in the GSA and Supplemental Agreement, the Court is convinced that parties' intention was not to grant Landow the right to handle all transient aircraft, but only to a limited subset of transients coming to visit Landow or its tenants for specific business

purposes.  To hold otherwise would render the GSA and SA
internally conflicting and irreconcilable.

   2.  Breach

        The Court finds that Signature has satisfied its burden
of successfully proving the following contractual duties of
Landow: (1) Landow may not provide the services of an FBO; (2)
Landow may not act as or hold itself out as an FBO; and (3)
Landow may not service transient aircraft on the DJC premises
except for a limited class of those visiting Landow or Landow's
tenants for specific business purposes at Dulles.  The next
inquiry for the Court is whether Defendant breached these legal
obligations under the GSA.  The following evidence from the
record suggests that Defendant has breached its contractual
obligations to Signature.

        The record shows that DJC is clearly offering and
providing many of the services that Signature is required and
permitted to provide under the Concession Contract and the
Supplemental Agreement to the transient aircraft market at Dulles
such as ground handling, taxiing, towing, ramp assistance, ground
power units, baggage handling, passenger assistance, ground
transportation, rental car services, and catering.  (PTE 220);
(Meeusen at 13:16-15:3, Sept. 3, 2009 A.M.)  Landow did not
dispute at trial that it is indeed offering many of these
services to the general transient aircraft market.

33

According to the testimony of Farmer and Bennett, after the opening of the DJC at Dulles, they witnessed DJC personnel approach overflow transient aircraft that Signature had parked on DJC's ramp, invite these aircraft crew members to conduct their business at DJC, and hand out marketing brochures. (Farmer at 26:13-27:3, Aug. 31, 2009 P.M.); (Bennett at 125:10-20, Sep. 2, 2009 A.M.; 3:7-4:1; 4:16-5:6, Sept. 2, 2009 P.M.) The record also shows that Landow is soliciting the general transient aircraft business and marketing actively as an FBO despite Signature's demands that it cease and desist from doing so. (Farmer at 29:3-13, Aug. 31, 2009);(Crowther at 90:13-91:11, Sept. 3, 2009 P.M.) Landow advertises in the 2009 AC-U-KWICK FBO Guide, the national guide for FBO's used by pilots, (PTE 83, 177, 183, 257, 272); (Farmer at 49:18-52:6, Aug. 31, 2009 P.M.,) as well as on Fltpln.com and Airnav.com, the websites directed to the general transient aircraft market. (PTE 162, 207, 246.)

The record is replete with evidence that Landow is improperly holding DJC out to the general aviation community as an FBO. (PTE 45, 139.) For example, DJC's employees often refer to DJC as an FBO when speaking to customers and potential customers (PTE 105, 132, 186) and its employees represent to the public that "besides fuel, we provide all other services an FBO provides." (PTE 270.) At the request and approval by Nathan Landow, DJC placed advertisements in the United Airlines lounges for its employees at Dulles and Chicago's O'Hare International

34

Airport presenting DJC as the "newest FBO" at Dulles.  (PTE 171);
(Meeusen at 40:24-42:10, Sept. 3, 2009, A.M.)  Landow also
referred to DJC as an FBO when soliciting Dow Chemical to become
DJC's new transient customer.  (PTE 105.)

Based on the extensive testimony and supporting
material in the record, the Court holds that Signature has
properly proved that Landow breached its obligation owed to it
under the GSA.

### 3. Damages

At trial, in addition to proving Defendant's
contractual obligation and the breach of such obligation,
Plaintiff had to prove, by preponderance of evidence, that it has
suffered damages because of Defendant's breach.  Plaintiff's
burden was to prove "with reasonable certainty the amount of
damages and the cause from which they resulted; speculation and
conjecture cannot form the basis of the recovery." *Shepherd v.*
*Davis*, 574 S.E.2d 514, 524 (Va. 2003) (quoting *Carr v. Citizens*
*Bank & Trust Co.*, 325 S.E.2d 86, 90 (1985)).  Thus,

> where the loss of prospective profits is the direct and
> proximate result of the breach . . . and they can also
> be proved with a reasonable degree of certainty, such
> loss is recoverable, but it is equally well settled
> that prospective profits are not recoverable in any
> case if it is uncertain that there would have been any
> profits, or if the alleged profits are so contingent,
> conjectural, or speculative that the amount thereof
> cannot be proved with a reasonable degree of certainty.

*Sinclair Refining Co. v. Hamilton & Dotson*, 178 S.E. 777, 780 (1935) (citing *Manss-Owens Co. v. H.S. Owens & Son*, 105 S.E. 543, 549-50 (1921)).  Based on these principles, the Court inquires whether Plaintiff has proven two factors: (1) "a causal connection between the Defendant's wrongful conduct and the damages asserted; and (2) "the amount of those damage by using a proper method and factual foundation for calculating damages." *Saks Fifth Avenue, Inc. v. James, Ltd.*, 630 S.E.2d 304, 311 (Va. 2006) (internal citation omitted).

Signature attempted to prove its damages through the testimony of Bennett.  Bennett testified that Signature started to lose its former customers like Dow Chemical, Eli Lily, and Black & Decker almost immediately after DJC's opening.  (Bennett at 93:19-95:6, Sept. 2, 2009 A.M.)  Bennett stated that he observed Signature's customers bypassing Signature's ramp to get to the Dulles Jet Center from his vantage point overlooking both facilities.  (Bennett at 93:19-94:15, Sept. 2, 2009 A.M.)  When it started to lose its customers to DJC, Signature began tracking such aircraft bypassing Signature and traveling directly to DJC. (Bennett at 95:24-96:1, Sept. 2, 2009 A.M.); (PTE 242.) Signature contends that it loses revenue from parking fees and handling charges, assuming no fueling, when these transient aircraft bypass Signature's FBO.  (Bennett at 107:6-13, Sept 2, 2009 A.M.).

36

To further support its point and to prove its damages in more concrete manner, Signature presented at trial its National Sales Detail Report as evidence of "long-standing" customer relationships that have been disrupted or destroyed by Landow's conduct.  (PTE 210.)  The National Sales Detail Report identifies the following information regarding 153 aircraft who previously used Signature's business: (1) the tail number of each aircraft; (2) the date on which each aircraft began its customer relationship with Signature's FBO at Dulles; (3) the standard parking fee paid to Signature on each trip to Dulles for parking fees and handling charges by each aircraft; (4) the date on which that aircraft stopped using Signature's FBO at Dulles and began using the Dulles Jet Center; and (5) the revenue Signature allegedly lost in handling charges and parking fees each time that aircraft bypassed Signature's ramp for DJC.  (Bennett at 114:23-119:20, Sept. 2, 2009 A.M.); (PTE 210.)  From this information, Plaintiff estimates that it has lost a total of $154,810.00.  (Pl's Proposed Findings of Fact and Conclusions of Law (Pl's Mem.") at 29.)

Additionally, Signature contends that because it has lost at least 7 transients to DJC per day on average, based on Bennett's testimony, and the average handling charge based on the National Sales Detail Report is $525 per plane, that it has lost $3,675 in lost revenues per day.  Signature claims that this calculation method yields $4,013,100 in total lost revenue that

Signature lost from October 2006 to October 2009.  (Bennett at 99:15-23, Sept, 2, 2009 A.M.); (PTE 210.)

The Court holds that the evidence proffered by Plaintiff at trial failed to prove the amount of damages with a reasonable certainty and a causal connection between Landow's wrongful conduct and the estimated damages claimed by Signature. First, the e-mail document which supposedly reflects Signature's record of transient aircraft traffic at DJC included customers who have never used Signature previously.  (PTE 242); (Bennett, 52:2-53:17, Sept. 2, 2009 A.M.)  No evidence was adduced at trial that these transient customers who had never previously used Signature would have chosen Signature over other FBOs located at the nearby airports (*e.g.,* BWI, MNZ, KJYO) had DJC not been an option for them.  Second, it is unclear that the 153 aircraft identified by Plaintiff in its National Sales Detail Report actually evidences "long standing" customer relationship between these clients and Signature.  No evidence was produced to refute very realistic possibility that these supposed "long customers" of Signature were also long customers of Landmark at Dulles or of other FBOs at nearby airports.  In other words, the fact that a customer used Signature a few times over the expansive period of time prior to October 2006 does not necessitate the finding that they are, in fact, loyal and long standing customers of Signature.

38

The Court also notes that based on its observation, it found Bennett evasive and his testimony prevaricating when it came to the issue of damages and how accurately Signature's record reflected transient customers that Signature's FBO lost to DJC.  For example, Bennett suggested to the Court that Signature's log of DJC transient aircraft traffic (PTE 242) accurately reflected all of Signature's transient customers that it lost to DJC.  However, the log included transient aircrafts that were never customers of Signature and Bennett knew that these customers could have chosen another FBO in the absence of DJC.  (Bennett 52:2-54:8, Sept. 2, 2009 A.M.)  Also, even though Bennett testified that the National Sales Report reflected a list of Signature's "loyal and frequent" customers, he conceded during the cross-examination that some of these customers have only used Signature's FBO once before they moved to DJC and that the document may actually be incomplete with respect to time period it covered.  (Bennett 105:21-108:24, Sept. 2., 2009 A.M.)

Signature failed to present any testimony from any of its former customers that the sole reason they left Signature for DJC was DJC's opening and solicitation, and that they would have used Signature's FBO otherwise.  Basically, Plaintiff supposes that these customers would have never left Signature, used Signature's FBO services as many times as they have used DJC, had DJC not violated its obligations under the GSA.  It is quite probable that some of these customers simply grew dissatisfied

with Signature's FBO services or the prices of these services as
compared to other FBOs in the area.  In other words, Signature
failed to produce any testimony from its former customers that it
would have continued to use Signature, as many times as they used
DJC during the relevant time period, if DJC had not been an
option for them.  It would be much too speculative for the Court
to blindly assume that all identified former customers of
Signature would have conducted business with Signature during the
relevant period especially in light of the presence of another
FBO at Dulles and other FBOs at the airports in close vicinity.

        Thus, the Court cannot be reasonably certain that the
damage figure proposed by Signature closely reflects its lost
revenue over three years.  Based on these reasons, the Court
finds that while Plaintiff was harmed, it has failed to prove the
damage prong of its breach of contract claim.  Thus, the Court
will not award any damages based on Defendant's breach.

B.  Declaratory Judgment

        Signature seeks a declaratory judgment regarding the
parties' rights under the relevant contracts.  Based on the
foregoing analysis regarding Defendant's contractual obligations
and its breach thereof, the Court declares that, for the duration
of the GSA: (1) Signature has the exclusive right to service
transient aircraft on the Dulles Jet Center premises except for a
limited class of guests, visitors and invitees affiliated with or
visiting Landow or Landow's tenants for specific business

purposes; (2) Landow must cease and desist from servicing transient aircraft, as well as from holding itself out as or acting as an FBO, from providing the services of an FBO unless otherwise allowed, and from preventing Signature from accessing the Dulles Jet Center ramp for uses in the manner consistent with the GSA.

C.   Accounting and Disgorgement

Signature has also requested the Court to order Landow to account for all profits realized from illegally servicing Signature's transient customers and disgorge Signature's loss of profits.  "Under Virginia law, an accounting is a form of equitable relief which is available upon order of a court in equity providing for an accounting of funds *among those with a partnership or other fiduciary relation inter se*." *McClung v. Smith*, 870 F.Supp. 1384, 1400 (E.D. Va. 1994) (emphasis added); *Williams v. Reynolds*, 2006 WL 3007347 (W.D. Va. 2006).  Neither evidence produced at trial nor the pleadings before this Court suggest that this case involves a partnership or fiduciary relationship.  Accordingly, the Court will not order equitable relief of accounting and disgorgement in this case.

D.   Permanent Injunction

Signature requested that the Court permanently enjoin Landow from the following: "(a) acting or holding Dulles Jet Center out as an FBO; (b) soliciting and servicing transient

41

aircraft; (c) handling and servicing transient aircraft approaching the Signature or Dulles Jet Center ramps and invoicing for and collecting fees for these services or otherwise interfering with Signature's ability to perform these functions other than the limited class of guests, visitors and invitees previously recognized; and (d) preventing Signature from using the Dulles Jet Center ramp to park Signature's overflow transient or other aircraft or interfering with Signature's ability to perform these functions" in the manner consistent with the GSA. (Pl.'s Mem. at 46.)

To obtain a permanent injunction, Plaintiff must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *Christopher Phelps & Associates, LLC v. Galloway*, 492 F.3d 532, 543 (4th Cir. 2007) (internal citation omitted).  However, even if Plaintiff demonstrates all four elements, the Court may still deny to grant a preliminary injunction in its "equitable discretion."  *Id.*

Typically, a party may show an irreparable injury by demonstrating a "possibility" that it will suffer a "permanent loss of customers to a competitor or the loss of goodwill."

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable
Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994).  Landow's
violation of its contractual duties caused Signature to lose some
of its customer base and goodwill.  If the injunction is not
granted, Signature will continue to lose its customers, possibly
lose its opportunity to attract new customers, and goodwill in
the industry.  Because such past and future damages are difficult
to measure, the Court finds that Plaintiff has met its burden
with respect to the first factor.  *See id.*[5]  Secondly, monetary
damage in this case is inadequate because it would not prevent
the future injury that would be suffered by Plaintiff without the
injunction.  It would be neither adequate or efficient to have to
require Plaintiff to file a breach of contract in the future to
be able to recover for its loss.

The third prong, the balance of hardships test between
Plaintiff and Defendant, favors Plaintiff.  If the Court does not
grant the permanent injunction, it is possible that Defendant
would continue to violate its obligations under the GSA and
Plaintiff will suffer loss of current and potential customers and
revenues from such customers stemming from the violation.
Enjoining Defendant from being able to continue its violation of

---

[5] The Court rejects Defendant's argument that injunctive relief is
inappropriate because the loss shown by Plaintiff in this case is *de minimus*.
(Def.'s Proposed Findings of Fact and Conclusions of Law. ("Def.'s Mem.") at
66.)  Even though the Court has held that Plaintiff's proof of damage was not
certain enough for this Court to award damages, the Court finds that Plaintiff
has shown that the loss it suffered was not *de minimus* especially in light of
possibility of a continuing injury.

the GSA will effectively prevent Plaintiff from suffering further damages.  Granting the injunction will not harm Defendant because it merely forces Landow to abide by its own contractual obligations.  *See JTH Tax, Inc. v. Donofrio*, 2006 U.S. Dist. LEXIS 73692 *14 (E.D. Va. 2006) ("[a]n injunction will do nothing more then [sic] enforce Defendant's contractual obligations."); *see also W. Insulation, L.P. v. Moore*, 2008 WL 191335, at *4 (E.D. Va. 2008).  Thus, enjoining Landow from continuing the breach will prevent future lawsuits brought to enforce Plaintiff's rights under the GSA.

Next, the Court finds that the public interest will not be disserved by enjoining Landow from violating its obligations under the GSA.  An injunction in this case will serve the public interest because it will "insure that future violations will not occur" and prevent "future customers from being mislead" that DJC is allowed to service the general transient market.  *Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.*, 43 F.3d 922, 939 (4th Cir. 1995) (internal citations omitted).  Granting an injunction in this case supports and promotes the FBO business relationships that MWAA, a public entity charged with operational control of Dulles, endorsed at Dulles and would not vitiate the public bidding procurement process that MWAA has chosen to utilize in selecting the FBO providers at Dulles.  The Court will not deprive Signature of the benefit of the bargain that it

44

should receive, just because Defendant will incur significant
financial loss.  Landow did not participate in the bidding
process to obtain the right to operate an FBO concession at
Dulles, and the public interest would dictate that it should not
be able to create the right for which it did not compete.  For
those reasons, the Court holds that a permanent injunction
against Defendant is warranted.

Defendant argues that even if Plaintiff proved all four
elements proving the necessity for a permanent injunction, the
Court should exercise its discretion and deny the request because
"the equities" do not favor Plaintiff.  (Def.'s Mem. 67.)
Defendant states that Signature should have made it explicit that
Landow could not service transients in the GSA and that Signature
belatedly filed a lawsuit almost two years after the opening of
DJC.  (Def.'s Mem. 67.)  Defendant suggests that it was under the
impression that it could serve transients up until September 1,
2006 based on Signature's actions and that it is being harmed by
Signature's "ever-changing" position.  (Def.'s Mem. 67-68.)
Defendant also claims that Signature has "unclean hands" and the
doctrine of estoppel should apply.  (Def.'s Mem. 68.)  The Court
notes that these defenses might apply to all other Plaintiff's
claims in the Complaint and accordingly addresses them below.

E.  Affirmative Defenses by Landow: Estoppel, Waiver, Equities

"Estoppel, as a doctrine in equity, is the consequence
worked by operation of law which enjoins one whose action or

inaction has induced reliance by another from benefiting from a change in his position at the expense of the other." *Employers Commercial Union Ins. Co. of America v. Great Am. Ins. Co.*, 200 S.E.2d 560, 562 (Va. 1973).  Under Virginia law, absent a showing of fraud and deception, a party asserting equitable estoppel must establish representation, reliance, a change of position and detriment.  *T v. T*, 224 S.E.2d 148, 152 (1976).  Additionally, "waiver is an intentional relinquishment of a known right." *Stanley's Cafeteria, Inc. v. Abramson*, 306 S.E.2d 870, 873 (Va. 1983).  To establish waiver, two elements must be proven by clear, precise and unequivocal evidence: (1) "knowledge of the facts basic to the exercise of the right" and (2) "the intent to relinquish that right." *Employers Commercial Union Ins. Co. of America v. Great American Ins. Co.*, 200 S.E.2d 560, 562 (1973); *Utica Mut. Ins. Co. v. Nat'l Indem. Co.*, 173 S.E.2d 855, 858 (1970).

     The evidence in the case clearly and sufficiently shows that Signature has not relinquished its contractual right at any point.  Instead, Signature promptly informed Landow regarding Landow's violation of its contractual duties and steadfastly tried to stop Landow from continued violation of the relevant contracts.  *See* (PTE 48, 68, 71, 178, 187A.)  Thus, the Court rejects Defendant's waiver argument.  The Court also notes that Defendant may not receive the benefit of estoppel.  The

46

substantial evidence shows that Signature has never suggested to Landow that it could service transients or provide FBO services before or after signing of the GSA. Thus, it is Defendant's overall conduct that suggests that it, not Plaintiff, might have unclean hands. *Cline v. Berg,* 273 639 S.E.2d 231, 233-234 (Va. 2007) ("He who comes into equity must come with clean hands . . . [T]he complainant seeking equitable relief must not himself have been guilty of any inequitable or wrongful conduct with respect to the transaction or subject matter sued on.")

The unrebutted testimony at trial suggests that Nathan Landow knew that DJC was not supposed to service the general transient market and not to provide FBO services under the relevant contracts. However, he spent too much money in constructing DJC, tried to get himself out of the bad deal, and failed. He was in over his head with the deal he struck. According to Farmer, whose testimony this Court found believable and credible, Nathan Landow specifically requested in early 2004 that DJC be permitted to service the transient aircraft market during their meeting in Signature's conference room at its FBO facility at Dulles and Farmer advised Nathan Landow that Signature would not allow Landow to do so. (Farmer at 87:3-19, Aug. 31, 2009, A.M.)

On October 25, 2006, Farmer and Bennett met with Nathan and David Landow to discuss the transient aircraft issues and inform them that Landow is not to service the transient aircraft

market at Dulles and that it violated the GSA.  (Farmer at 27:23-29:13, Aug. 31, 2009 P.M.);(Bennett at 5:2-6:19, Sept. 2, 2009, P.M.)  At this meeting, Nathan Landow requested a change in the deal by increasing Landow's share of revenue from Signature's overflow parking and even cutting MWAA completely out of its entitlement.  (Farmer at 29:14-30:7, Aug., 31, 2009 P.M.); (PTE 55.)  Such testimony from Farmer and Bennett was unrebutted. Farmer also testified that Landow attempted to bribe him and offered to make it "worth his while" if Farmer could help convince Signature management to acquire Dulles Jet Center even before its opening. (Farmer at 6:16-7:14, Aug. 31, 2009 P.M.)

Farmer testified that the issue of transients was brought up at a dinner meeting at the NBAA convention in Las Vegas, Nevada, in October, 2004, before the Supplemental Agreement was ratified.  (Farmer at 53:4-54:8, 57:25-62:5, Sep. 1, 2009.)  Both Farmer and Haskins testified that, at that dinner meeting, Haskins expressly told Nathan Landow that DJC would not be permitted to handle the transient aircraft market when Nathan Landow raised the issue.  In fact, Haskins informed Nathan Landow that it would be a "deal breaker" and Nathan Landow agreed that it would not do so.  (Farmer at 87:21-88:14, Aug. 31, 2009 A.M.; Haskins at 66:1-67:25, Sept. 3, 2009 A.M.)  Farmer testified that if he thought Landow did not understand what Signature's position on the transient issue, he would have asked MWAA not to sign and ratify the Supplemental Agreement.  (Farmer at 88:22-89:4, Aug.

48

31, 2009 A.M.)  The Court will not discredit Farmer's testimony simply based on the fact that he has confused the timeline in his previous depositions.  The Court found his unrebutted testimony credible and believable especially in light of the fact that his testimony was corroborated by Haskin's testimony.  The Court found Haskins, who retired from Signature in 2005, to be credible and unbiased.  (Haskins at 60:4-12, Sept 3, 2009 A.M.)

The evidence in the record suggests that Landow knew it was violating the GSA but continued to violate it anyway.  For example, Nathan Landow's own handwritten list, written on memorandum paper "from the Desk of David Landow" specifically states that "no transient will be considered a Landow customer," and "Hangar and ramp based customers under lease are Landow customers."  (PTE 213.)  Further, even after Landow informed MWAA that it would abide by MWAA's finding that DJC was not to promote itself as an FBO or service the general transient aircraft market, it continued to violate the terms of the GSA.  (PTE 192.) It sought additional signage at Dulles, tried to gain additional aircraft parking space during the Presidential Inauguration activities, and attempted to be added to the MWAA's website under the FBO heading with the "other" FBOs at Dulles.  (PTE 193, 194.)

During its closing argument, Signature highlighted for the Court's consideration the fact that Nathan Landow did not testify to rebut the substantial amount of evidence and testimony regarding his knowledge of prohibition regarding servicing the

49

general transient market or intent to ignore the parties'
agreement.  Though the Court certainly would have found Nathan
Landow's testimony interesting and highly relevant, the Court
refuses to draw a negative inference based on Landow's decision
not to call Nathan Landow.  "Before a party can raise the
possibility of drawing an inference from the absence of a
witness, the party must show that the absent witness was
peculiarly within the other party's power to produce and that
witness possessed testimonial knowledge."  3 Fed. Jury Prac. &
Instr. § 105.11 (5th ed. 2009) (citing *Mammoth Oil Co. v. United
States*, 275 U.S. 13, 52, 48 S.Ct. 1, 10, 72 L.Ed. 137 (1927)).
This was not the case here.  Nathan Landow was not "peculiarly
within" Landow's power to produce.  Signature did not demonstrate
that it could not require or cause Nathan Landow to testify at
trial and that Landow had the exclusive ability to do so.  *Jones
v. Meat Packers Equipment Co., 723 F.2d 370, 373* (4th Cir. 1983);
*see also Neeley v. Johnson*, 215 Va. 565, 57374, 211 S.E.2d 100,
10708 (1975); *Dunlap v. G. & C. Towing, Inc.*, 613 F.2d 493, 497
(4th Cir.1980).  Signature could have subpoenaed Nathan Landow if
it wanted to examine him or offered or produced relevant excerpts
from Nathan Landow's deposition.  Thus, the Court does not draw
any negative inferences from the fact that Nathan Landow did not
testify.

However, even without the adverse inference requested by Plaintiff, the Court concludes that the unrebutted testimony of the witnesses and materials in the record overwhelmingly suggest the following:  Nathan Landow, who negotiated the terms of the SA and GSA and executed GSA himself, was aware of DJC's obligation not to service the general transient markets under the contracts, spent too much money in constructing DJC, realized that he had gotten himself into a bad deal, and tried to walk away from it.  When he could not walk away from it, he knowingly violated the terms of the GSA even though he knew he was violating the agreement.  These facts suggest that Signature has never any representations before or after executing the relevant contracts to let Landow form a belief that it could service the general transient market.  Though economically detrimental to Defendant, the Court does not believe it is inequitable to hold the parties to the duties and obligations they themselves understood and agreed to uphold under the contract in the absence of fraud or deception.  Based on this fact, the Court rejects Defendant's argument that equities do not favor Signature in this case.

F. Defendant's Counterclaims

In response to Plaintiff's complaint, Defendant Landow brought a number of counterclaims against Signature asking the Court for declaratory judgment on the following issues.

1.  Fuel Service Quality

51

Landow seeks a declaratory judgment regarding Signature's duty with regard to fuel service in accordance with the highest industry standard under the GSA.  Landow argues that Signature is violation Section 4.2(a) of the GSA because Signature is not providing fuel or invoicing for fuel sold to aircraft at DJC in manner consistent with the section.  Section 4.2(a) of the GSA provides, in part:

> . . . Signature, so long as Signature remains in occupancy of Signature's Premises, expressly represents and warrants that it will provide all of the Signature Exclusive Services to Sublessee and Sublessee's Representatives (i) in a timely, safe and proficient manner, when and as requested by Sublessee or a Sublessee Representative, subject to the force majeure provisions set forth herein, (ii) in accordance with *the highest standards of the aviation FBO industry* . . . .

(PTE 7 at § 4.2(a).)

Both parties' expert witnesses, Robert Showalter ("Showalter") for Signature and Richard Ryan ("Ryan") for Landow, testified that there is no published, officially promulgated, or written industry standard for fuel service response times.  (Ryan at 5:25-6:5, Sept. 3, 2009 P.M.); (Showalter at 44:8-24; 46:20-21, Sept. 15, 2009.)  However, both experts suggested that there are certain "customer expectations" and "general understanding among the industry" regarding fuel service response times.  (Ryan at 5:25-6:5, Sept. 3, 2009 P.M.); (Showalter at 44:8-24; 47:1-4, Sept. 15, 2009.)

52

Based on both parties' expert testimony, it appears that there are two types of fueling transactions in the general aviation industry: "quick turns" and "normal turns" for urgent and non-urgent operations, respectively. (Ryan at 7:20-8:6, Sept. 3, 2009 P.M.); (Showalter at 63:1-17, Sept. 15, 2009). Landow's expert, Ryan, testified that the highest industry standard for "quick turns" is 15 minutes from the aircraft being in the chocks to completion of the fueling transaction including delivery of an accurate invoice. (Ryan at 9:7-12, Sept. 3, 2009 P.M.) It appears that Ryan's expert testimony is consistent with Signature's Fill'n Fly Program, a program for Signature's fuel customers that was advertised and marketed publicly. (DTE 47 at LA104276.) Signature's Customer Service Standard Operating Procedures for the Fill'n Fly program provides that "the industry standard is 15 minutes to fuel" in a quick turn, recognized as an urgent procedure, from the time that chocks are in place for the aircraft and provided that there has been ten minute advanced notice that the customer requires such a turn; and Signature guaranteed a quick turn in 12 minutes. *Id.* Ryan further testified that, for a normal turn, the highest industry standard is completion of fueling and delivery of an accurate invoice within 30 minutes, so long as there has been ten minutes or more notice of the request for fueling. (Ryan at 9:18-19, Sept. 3, 2009 P.M.)

53

Though there appears to be general understanding in the industry and expectations among the customers regarding what fuel service response time should be for quick and normal turns, the Court opines that it need not decide what the actual highest standards of the aviation FBO industry requires in this case. Overwhelming evidence in the case suggests that Landow was offered numerous opportunities by Signature to eradicate Landow's concerns regarding the fuel response time, yet denied such offers without a valid reason.  For example, Signature purchased a new $350,000 fuel truck to be stationed on the Dulles Jet Center ramp for the exclusive use of the tenants based at DJC and placed it on the DJC's ramp.  (Farmer at 59:20-60:14, Aug. 31, 2009 P.M.) A few days later, Nathan Landow called Bennett and told him to "get the f'ing truck off the ramp."  Nathan Landow said he didn't understand the benefit of a having a fuel truck exclusively dedicated to DJC and rejected Signature's effort to improve its fuel response time.  (Bennett at 28:16-29:8, Sept. 2, 2009 P.M.); (Farmer at 71:12-72-13, Aug. 31, 2009 P.M.)  Signature's offer to dedicate a service representative to handle Dulles Jet Center requests exclusively was also denied by Nathan Landow without a valid reason.  (Farmer at 71:12-72-13, Aug. 31, 2009 P.M.); (Bennett at 29:9-29:24, Sept. 2, 2009 P.M.); (PTE 131.)  Finally, Nathan Landow rejected without explanation Signature's offer to provide DJC a fuel order request form for Dulles Jet Center personnel to fill out which could prevent potential errors in the

oral transmission of a fuel order request.  (Bennett at 17:19-18:12; 25:16-26:4, Sept. 2, 2009 P.M.); (PTE 91.)

It is apparent based on this unrebutted evidence that, had Landow accepted these reasonable offers by Signature to improve its fuel service at DJC, it could have eliminated any concerns regarding timeliness of Signature's fuel services and potential errors associated with the invoicing process. "There is an implied condition of every contract that one party will not prevent performance by the other party. Hence if one of the contracting parties prevents the other party from performing under a contract, he cannot prevail in an action for nonperformance of the contract which he himself has brought about." *Whitt v. Godwin*, 205 Va. 797, 800 (Va. 1965); *Boggs v. Duncan*, 121 S.E.2d 359, 363 (Va. 1961) ("[H]e who prevents a thing may not avail himself of the nonperformance which he has occasioned") (internal quotations and citations omitted).  The unrebutted testimony of Farmer and Bennett indicates that this is what Nathan Landow has done here.  Thus, the Court declines to grant Declaratory Judgment as requested by Landow with respect to Signature's fuel service.

### 2. Plaintiff's Location of the Taxilane Centerline

Landow asks this Court to declare the parties' respective rights and obligations under the GSA regarding the area that it refers to as a "taxilane" located on Signature's

ramp.  The area in dispute is located on the northern part of Signature's ramp to the west of the grass berm located directly in front of DJC's Hangars A and B.  (PTE 232.)  Landow argues that: (1) Signature must maintain a "taxilane" on its ramp for DJC and its customers' aircraft for ingress and egress under the GSA; and (2) the "taxilane" should not be less than 162 feet wide and must extend from the point where the parties' ramp abut one another to the J-1 taxiway connector as depicted on Exhibit D of the GSA.  (Def.'s Mem. 70.)

First, the Court explores whether the GSA obligated Signature to maintain a taxilane on its ramp.  Section 2.1 of the GSA provides:

> In accordance with the provisions of Section 2.5 – Construction of Corporate Hangar Facilities below, *Sublessee agrees to construct* the Corporate Hangar Facilities in, on and to the Corporate Hangar Premises as provided in Exhibit "D" (the "Corporate Hangar Facilities Improvements") which will be attached hereto. It is understood and agreed that Sublessee's receipt of the Authority's written approval of Exhibit "D" hereto shall constitute the Authority's agreement to connect the Corporate Hangar Facilities to the Airport's airfield and utility systems, in the locations depicted on Exhibit "D."

(PTE 7 at § 2.1; Ex. D) (emphasis added.)  Exhibit D of the GSA as well as Landow's construction drawings and specifications, as approved by Signature and MWAA, identify a "taxilane centerline." (PTE 7 at Ex. D; DTE 135, 136, 137.)  However, none of the construction drawings and specifications and Exhibit D to the GSA

reflect or identify any required dimensions for the "taxilane" at issue.  *Id.*

Under Section 10.1 of the GSA, Signature grants Landow "the nonexclusive right to move aircraft between the Corporate Hangar Premises and Signature's airport parking ramps and apron and across designated portions of Signature's Premises to designated Airport taxiways and ramps . . . ."  (PTE 7 at § 10.1(a).)  Section 10.3 of the GSA adds that "[t]he rights granted and/or reserved to Sublessee and Signature, as the case may be, in Sections 10.1 and 10.2 hereof, shall constitute easements that shall run with the land."  (PTE 7 at § 10.3.) Landow recorded a Memorandum of Ground Sublease Agreement memorializing the easement.  (DTE 2.)

Landow contends that: (1) Exhibit D of the GSA reflects the non-exclusive easement identified in Sections 10.1 and 10.3 of the GSA, and (2) "Taxilane Centerline," as identified on Exhibit D, evidences Signature's obligation to have a "taxilane" on its ramp in accordance with the FAA's Advisory Circular. (Def.'s Mem. 46); (DTE 124 at 3.)  The FAA's Advisory Circular provides that a taxilane for Group III aircraft must have an object-free area that is 162 feet wide.  (DTE 124 at 38.) Signature does not contest that Landow has an easement to move aircraft across its ramp pursuant to Sections 10.1 and 10.3 of

the GSA, but contends that no drawings Landow submitted establishes the required width of the easement.  (Pl.'s Mem. 53.)

The Court agrees with Signature.  Based on the plain language of the GSA, the Court finds that Section 2.1 does not impose any obligations on Signature with respect to construction of the Corporate Hangar Premises.  (PTE 7 at § 2.1; Ex. D.)  Rather, Section 2.1 imposes on Landow an obligation to construct the Corporate Hangar Facilities on the Corporate Hangar Premises as depicted in Exhibit D.  (PTE 7 at § 2.1.)  The Court will not fault Signature for the current width of the "taxilane" in light of the clear and unambiguous language of the GSA, which does not obligate Signature to construct or maintain on its premise a "taxilane" as depicted in Exhibit D.  (PTE 7 at § 2.1.)  Thus, the Court will not and need not apply the standards set forth in the FAA advisory circular regarding the width of a taxilane for Group III aircraft.  Sections 10.1 and 10.3 of the GSA simply provides an easement to Landow to access designated portions of Signature's ramp for the movement of its aircraft which may involve ingressing and egressing to and from DJC to Airport taxiways and ramps.  (PTE 7 at §§ 10.1, 10.3.)  The Court refuses to make any determination as to the width and length of the area Landow contends constitutes a "taxilane."

The Court also refuses to declare that Signature must not park its aircraft in the disputed area.  In Virginia, "when a tract of land is subjected to an easement," as here, "the owner may make any use of the land that does not unreasonably interfere with the use and enjoyment of the easement."  *Preshlock v. Brenner*, 362 S.E.2d 696, 698 (Va. 1987) (citing *Willing v. Booker*, 168 S.E. 417, 418 (Va. 1933)).  Thus, the Court finds that Signature may park aircraft in this easement area so long as it moves Signature's aircraft upon *reasonable* notice by Landow that it has a legitimate and reasonable need to use this disputed area to facilitate the movement of its aircraft.

## 3.  Encroachment

Section 10.2(a) of the GSA states that "Signature shall be afforded access to designated portions of the Corporate Hangar Premises' airport parking ramps and apron *for the movement of aircraft* and aircraft support vehicles to and from the Airport's taxiways and ramps" subject to "the availability of vacant space on the Corporate Hangar Premises as determined by [Landow] in its sole but reasonable discretion."  (PTE 7 at § 10.2(a)) (emphasis added.)  Further, under Section 10.2(b) of the GSA, Signature has "the right and privilege to relocate Signature's customers' aircraft from Signature's Premises to reasonably designated portions of the Corporate Hangar Premises."  (PTE 7 at

59

§ 10.2(b).)

Landow claims that Signature's customer's aircraft have illegally encroached upon DJC's ramp when Signature used DJC's ramps to turn its aircraft without request or permission of Landow to facilitate parking on Signature's ramp.  (Def.'s Mem. 48.)  Signature claims that it is only using vacant space to turn aircraft and that the GSA does not include a requirement for Signature to contact Landow before utilizing its access rights to the Landow ramp.  (Pl.'s Mem. 54-55.)  Landow seeks a declaratory judgment with respect to whatever rights of access Signature may have for its customer's aircraft on DJC's property under Section 10.2(a) and (b) of the GSA.

Based on the evidence of record, it appears that Signature's customer's aircraft may only enter DJC's premises if they are being relocated to DJC's premises in accordance with Section 10.2(b) of the GSA; or they are accessing designated portions of the Corporate Hanger Premises' airport parking ramps and apron to facilitate movement of aircraft or availing themselves of access rights across DJC's ramp to a taxiway as permitted pursuant to Section 10.2(a) of the GSA.  The turning of an aircraft clearly falls into the latter categories.

Though Section 10.2 of the GSA explicitly states that sub-section (a) and (b) are subject to the availability of vacant

space as determined by Landow in its reasonable discretion, it does not say anywhere that Plaintiff needs to contact Landow before utilizing its rights under the section.  (PTE 7 at § 10.2.)  Thus, the Court finds that Plaintiff does not have an obligation to contact or request permission from Landow every time its customer's aircraft enters DJC so long as Signature acts in accordance with Section 10.2 of the GSA.  However, if Landow, in its reasonable discretion, believes that there is no availability of vacant space on the Corporate Hanger Premises at the time Signature tries to access designated portions of the DJC pursuant to Sections 10.2(a) and (b) of the GSA, it may then have right to refuse Signature from entering DJC's premises.

4.  Delay and Unreasonable Denial of Westwind and Arcadia Permits

Section 2.5(p)(i) of the GSA provides that Signature must:

> . . . respond within ten (10) business days after its receipt of all items reasonably required to make an informed evaluation and decision with respect to [a permit] request time being of the essence. . . . Signature shall have the right to reasonably approve, reject or require changes to proposals submitted by [Landow] to Signature.  If Signature does not respond to any such request in writing within ten (10) business day period, [Landow] shall provide a second written notice to Signature.  If Signature does not respond to this second notice within ten (10) business days of

61

receipt by Signature, such request shall be deemed
approved."

On October 7, 2008, Landow submitted to Signature and
MWAA a proposed permit for a hangar based tenant known as
Westwind.  (DTE 35.)  On October 28, 2008, MWAA approved the
permit for Westwind. (DTE 36.)  On November 3, 2008, Landow
submitted a proposed permit for another hangar based tenant known
as Arcadia Aviation ("Arcadia") to Signature and MWAA for
approval. (DTE 37.)  On January 15, 2009, MWAA approved the
permit for Arcadia. (DTE 38).  For both of these permits,
Signature failed to respond to Landow's requests for approval
within ten (10) business days.  Thus, on January 30, 2009, Landow
sent his second written notice to Signature asking for approval
of the Westwind and Arcadia permits.  (DTE 39; Potter at 61:8-19,
Sept. 4, 2009).  On February 10, 2009, which is within ten (10)
business days from January 30, 2009, Signature sent a letter to
Landow disapproving the Westwind and Arcadia permit requests
without setting forth any reasons for disapproval.  (DTE 40.)
Some time after February 10, 2009, Signature provided Landow its
reasons for disapproval. (Potter at 64:11-15, Sept. 4, 2009.)

The Court first notes that Signature did not violate
Section 2.5(p)(i) of the GSA.  The plain language of this section
simply states that Signature must "respond" to the second notice

regarding the permits of Landow within ten (10) business day of receipt and does not specify that Signature must give its reasons for disapproval in its response within such time period.  (PTE 7 at § 2.5(p)(i).)  Thus, the Court believes that Signature's February 10, 2009 response that it was disapproving the permits met the requirement under the GSA.[6]

Signature stated that it disapproved the Westwind and Arcadia permits because of, among others, its concerns over Landmark, the other FBO at Dulles, providing aircraft management services on DJC premises and its concerns over the fact that the parties had a different interpretation regarding certain language pertaining to transient aircraft.  (Landow at 54:17-56:8, Sept. 16, 2009); (McDowell at 18:8-31:25, Sept. 15, 2009.)  Some of the language Signature based its disapproval upon had appeared in the Landow permit previously. (McDowell at 20:12-22; 21:19-21, Sept. 15, 2009).  Wendy McDowell ("McDowell"), a senior legal counsel at BBA Shared Services, Inc., which provided legal services to Signature, testified that Signature had legitimate concerns over the Westwind and Arcardia permits, even though some of the language had previously been approved, because it became clear to

---

[6] Because the Court believes that Signature's action did not violate the duty prescribed by the plain language of Section 2.5(p)(i) of the GSA, it need not address whether Plaintiff's exhibit 282, a series of e-mail correspondence between David Landow and Wendy McDowell, constitutes a written, duly executed "no hurry, no rush" policy.

her at a later point that the parties had different interpretation of the pertinent language contained in the permits.  (McDowell at 22:1-15; 27:8-15; 29:14-15; 31:1-6.)

The Court finds the reasons proffered by McDowell as basis for Signature's permit disapproval to be legitimate and reasonable.  Just because Signature has previously approved permits including substantially similar language as the proposed permits does not mean that Signature did not have right to reject future requests based on their newly found concerns.  Based on these reasons, the Court will deny Defendant's request for declaratory judgment regarding Westwind and Arcadia permits.

### III. Conclusions of Law

1.  Plaintiff Signature is a corporation organized under the laws of Delaware with its principal place of business located in Orlando, Florida.  Defendant Landow is a Virginia limited partnership that has its principal place of business in Dulles, Virginia.  Thus, these parties are diverse for purposes of jurisdiction.  Since parties' dispute involves an amount in controversy greater than $75,000, this Court has proper diversity jurisdiction pursuant to 28 U.S.C. § 1332.  Additionally, the Court will exercise jurisdiction over the declaratory claims as to the rights and obligations of the parties pursuant to 28 U.S.C. §§ 2201, 2202.

2.   The Court finds in favor of Defendant as to
Plaintiff's claim of Breach of Contract (Count II) because
Plaintiff failed to prove its damages by preponderance of
evidence.

3.   The Court finds in favor of Defendant as to
Plaintiff's request for Accounting and Disgorgement (Count IV)
because it is not an available remedy in this case;

4.   The Court finds in favor of Plaintiff as to
Plaintiff's request for Declaratory Judgment (Count I) and
declares that for the remaining duration of the GSA: (1)
Signature has the exclusive right to service transient aircraft
on the Dulles Jet Center premises except for a limited class of
guests, visitors and invitees affiliated with or visiting Landow
or Landow's tenants for specific business purposes; and (2)
Landow must cease and desist from servicing transient aircraft,
as well as from holding itself out as or acting as an FBO, from
providing the services of an FBO unless otherwise allowed, and
from preventing Signature from accessing the Dulles Jet Center
ramp for uses in the manner consistent with the GSA.

5.   The Court finds in favor of Plaintiff as to its
request for Permanent Injunction (Count V) and, for the remaining
duration of the GSA, enjoins Defendant from: (1) acting or
holding Dulles Jet Center out as an FBO; (2) soliciting and

65

servicing transient aircraft; (3) handling and servicing transient aircraft approaching the Signature or Dulles Jet Center ramps and invoicing for and collecting fees for these services or otherwise interfering with Signature's ability to perform these functions other than the limited class of guests, visitors and invitees previously recognized; and (4) preventing Signature from using the Dulles Jet Center ramp to park Signature's overflow transient or other aircraft or interfering with Signature's ability to perform these functions in the manner consistent with the GSA.

6.   The Court finds in favor of Counterclaim Defendant Signature as to Counterclaim Plaintiff Landow's claims of Declaratory Judgment (Counts I and III) and denies Landow's request for this Court to make its proposed declarations regarding fuel service quality, taxilane, and permits.

An appropriate Order will issue.

March 17, 2010                    _____/s/_____
Alexandria, Virginia                       James C. Cacheris
                             UNITED STATES DISTRICT COURT JUDGE